# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 14-1250

**CYNTHIA BRIDGES, SEC., DEPT. OF REV., STATE OF LOUISIANA**

**VERSUS**

**NELSON INDUSTRIAL STEAM CO.**

### Consolidated With
### 14-1251

**NELSON INDUSTRIAL STEAM CO.**

**VERSUS**

**CALCASIEU PARISH SCHOOL SYSTEM SALES AND USE TAX DEPT., ET AL.**

### Consolidated With
### 14-1252

**CYNTHIA BRIDGES, SEC., DEPT. OF REV., STATE OF LOUISIANA**

**VERSUS**

**NELSON INDUSTRIAL STEAM CO.**

### Consolidated With
### 14-1253

**NELSON INDUSTRIAL STEAM CO.**

**VERSUS**

**CALCASIEU PARISH SCHOOL SYSTEM SALES AND USE TAX DEPT., ET AL.**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2008-6375, C/W 2010-3564,
C/W 2010-5853 & C/W 2013-2661
HONORABLE RONALD F. WARE, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**ULYSSES GENE THIBODEAUX**
**CHIEF JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billy Howard Ezell, and John E. Conery, Judges.

**CONERY, J., dissents and assigns reasons.**

**AFFIRMED.**

**H. Alan McCall**
**Stockwell, Sievert, Viccellio, Clements & Shaddock**
**Post Office Box 2900**
**Lake Charles, Louisiana 70602**
**Telephone:  (337) 436-9491**
**COUNSEL FOR:**
        **Defendant/Appellant - Nelson Industrial Steam Co.**

**Christopher J. Dicharry**
**Linda S. Akchin**
**Kean Miller LLP**
**400 Convention Street - Suite 700**
**Baton Rouge, Louisiana 70802**
**Telephone:  (225) 387-0999**
**COUNSEL FOR:**
        **Defendant/Appellant - Nelson Industrial Steam Co.**

**Russell J. Stutes, Jr.**
**Stutes & Lavergne, LLC**
**600 Broad Street**
**Lake Charles, Louisiana 70601**
**Telephone:  (337) 433-0022**
**COUNSEL FOR:**
        **Plaintiffs/Appellees - Cynthia Bridges, Sec., Dept. of Rev., State of**
        **Louisiana; Calcasieu Parish School System Sales & Use Tax Dept., and**
        **John Collins, Tax Administrator**

**Cheryl M. Kornick**
**Liskow & Lewis**
**One Shell Square**
**701 Poydras Street - Suite 5000**
**New Orleans, Louisiana 70139-5009**
**Telephone:  (504) 581-7979**
  **BRIEF OF *AMICUS CURIAE* - Louisiana Chemical Association**

**THIBODEAUX, Chief Judge.**

Nelson Industrial Steam Company (NISCO) appeals four judgments rendered against it in four consolidated tax cases. Two judgments in favor of Cynthia Bridges, Secretary, Louisiana Department of Revenue, State of Louisiana (State) ordered NISCO to pay taxes, penalties, and interest owed. Two judgments in favor of Calcasieu Parish School System Sales and Use Tax Department as Central Collector of Sales and Use Tax for the Parish of Calcasieu, and John Collins[1] in his Capacity as Administrator of the Calcasieu Parish School System Sales and Use Tax Department (Parish), dismissed NISCO's two suits for refunds of taxes, penalties, and interest paid under protest. Finding no legal error or manifest error in the judgments of the trial court, we affirm.

I.

## ISSUES

We must decide:

(1) whether the trial court erred in granting judgment against NISCO on the further processing issue;

(2) whether the trial court manifestly erred in not granting NISCO's request for attorney fees in suit no. 2013-2661 against the Parish;

(3) whether the trial court manifestly erred in imposing penalties against NISCO in suit nos. 2010-3564 and 2013-2661 against the Parish.

---

[1]John Collins is now deceased.

## FACTS AND PROCEDURAL HISTORY

NISCO constructs and operates power-generating facilities in the Lake Charles area. During the relevant tax periods, NISCO's revenue from the sale of electricity was $739 million. NISCO purchased sand and limestone for its generating process at a cost of $46 million. Generally, raw materials which are sold at retail and used up in the manufacturing process are considered tangible personal property, and they are subject to sales tax at the time of their purchase, unless a special exemption or exclusion applies. NISCO sought to be exempt from paying sales tax on its purchase of sand and limestone by invoking the "further processing" statute.[2]

The claims of taxes owed by the tax collecting agencies and the claims of NISCO for the tax exemption/exclusion ultimately resulted in four consolidated cases: two suits against NISCO by the State to collect taxes for the tax periods 2005–2007 and 2008–2012;[3] and two suits against the Parish by NISCO for refunds of taxes paid under protest for tax periods 2007–2009 and 2010–2012.[4]

The trial court initially heard cross-motions for summary judgment on the further processing issue and granted summary judgments in favor of the State

---

[2] Louisiana Revised Statutes 47:301(10)(c)(i)(aa) states: "The term 'sale at retail' does not include sale of materials for further processing into articles of tangible personal property for sale at retail."

[3] Suit no. 2008-6375, *Cynthia Bridges, Secretary, Department of Revenue, State of Louisiana v. Nelson Industrial Steam Company*; and suit no. 2010-5853, *Cynthia Bridges, Secretary, Department of Revenue, State of Louisiana v. Nelson Industrial Steam Company*, respectively.

[4] Suit no. 2010-3564, *Nelson Industrial Steam Company v. Calcasieu Parish School System Sales and Use Tax Department, et al.*; and suit no. 2013-2661, *Nelson Industrial Steam Company v. Calcasieu Parish School System Sales and Use Tax Department, et al.*, respectively.

and the Parish in the first three suits. On appeal, this court affirmed. *Bridges v. Nelson Industrial Steam Co.*, 12-477 (La.App. 3 Cir. 11/7/12), 106 So.3d 147. The Louisiana Supreme Court granted NISCO's writ application and vacated the summary judgment rulings, finding that genuine issues of material fact precluded summary judgment. *Bridges v. Nelson Industrial Steam Co.*, 13-171 (La. 3/8/13), 108 So.3d 1168. On remand, following a trial on the merits which included the fourth suit, the trial court rendered judgments again in favor of the State and the Parish, signing four separate judgments, one for each of the consolidated cases.[5] NISCO appealed. For the reasons that follow, we affirm the judgments of the trial court.

## III.

## <u>STANDARDS OF REVIEW</u>

Questions of law, such as the proper interpretation of a statute, are reviewed by an appellate court under the de novo standard of review. *Land v. Vidrine*, 10-1342 (La. 3/15/11), 62 So.3d 36. An appellate court may not set aside

---

[5]June 2, 2014 judgment in suit no. 2008-6375, *Cynthia Bridges, Secretary, Department of Revenue, State of Louisiana v. Nelson Industrial Steam Company*, in favor of the State, ordered NISCO to pay $591,071.91 in taxes, $12,929.10 in penalties, and $410,812.31 in interest through March 25, 2014, plus accruing interest (Appeal No. 14-1250);

June 2, 2014 judgment in suit no. 2010-3564, *Nelson Industrial Steam Company v. Calcasieu Parish School System Sales and Use Tax Department, et al.*, in favor of the Parish, dismissed NISCO's suit for refund of $911,683.79 in taxes, $227,921.01 in penalties, and $271,162.18 in interest through July 12, 2010, that were paid under protest (Appeal No. 14-1251);

June 2, 2014 judgment in suit no. 2010-5853, *Cynthia Bridges, Secretary, Department of Revenue, State of Louisiana v. Nelson Industrial Steam Company*, in favor of the State, ordered NISCO to pay $1,216,895.77 in taxes, $6,598.41 in penalties, and $310,589.16 in interest through March 25, 2014, plus accruing interest (Appeal No. 14-1252); and

June 2, 2014 Judgment in suit no. 2013-2661, *Nelson Industrial Steam Company v. Calcasieu Parish School System Sales and Use Tax Department, et al.*, in favor of the Parish, dismissed NISCO's suit for refund of $1,076,032.73 in taxes, $269,008.29 in penalties, and $275,788.58 in interest through May 13, 2013, that were paid under protest (Appeal No. 14-1253).

a trial court's findings of fact in the absence of manifest error or unless the findings are clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). If a trial court's findings are reasonable based upon the entire record and evidence, an appellate court may not reverse those findings even if it is convinced that had it been sitting as trier of fact it would have weighed the evidence differently. *Housely v. Cerise*, 579 So.2d 973 (La.1991). This principle of review is grounded upon the better capacity of the trial court to evaluate live witnesses and also upon the proper allocation of trial and appellate functions between the respective courts. *Canter v. Koehring Co.*, 283 So.2d 716 (La.1973).

IV.

## LAW AND DISCUSSION

The trial court's reasons for judgment consist of one short paragraph:

> It is indisputable that the [CFB] technology process NISCO employs in its production of steam and electricity requires the use of limestone. And, unavoidably, also produces ash, which it sells -- NISCO sells. It is also indisputable that limestone in any form, or its component parts, are not found in the steam and electricity produced. Just because the ash is an incidental byproduct of the [CFB] process, its production, even in combination with the production of steam and electricity, does not in and of itself permit NISCO to claim the benefit of the further processing tax exclusion on its purchase of limestone.

NISCO assigns seven errors regarding the above application of the further processing statute, La.R.S. 47:301(10)(c)(i)(aa). Whether the statute applies is essentially one issue and will be treated as such. NISCO assigns two additional errors regarding the imposition of penalties against NISCO and the

failure to award attorney fees to NISCO in NISCO's suits against the Parish. Thus, there are three main issues for review.

*General Legislation*

A manufacturer, like any consumer, is taxed on items of tangible personal property that it purchases and uses in manufacturing its product, pursuant to La.R.S. 47:302(A), which states in pertinent part: "There is hereby levied a tax upon the sale at retail, the use, the consumption, the distribution, and the storage for use or consumption in this state, of each item or article of tangible personal property, as defined herein . . . ."

Louisiana Revised Statutes 47:301(10) (emphasis added) states in pertinent part:

> (a)(i) Solely for the purposes of the imposition of the state sales and use tax, "retail sale" or "sale at retail" means a sale to a consumer or to any other person *for any purpose other than for resale* as tangible personal property, or for the lease of automobiles in an arm's length transaction, and shall mean and include all such transactions as the secretary, upon investigation, finds to be in lieu of sales . . . [.]

> (ii) Solely for purposes of the imposition of the sales and use tax levied by a political subdivision or school board, "retail sale" or "sale at retail" shall mean a sale to a consumer or to any other person *for any purpose other than for resale* in the form of tangible personal property, or resale of those services defined in Paragraph (14) of this Section provided the retail sale of the service is subject to sales tax in this state, *and shall mean and include all such transactions as the collector, upon investigation, finds to be in lieu of sales; provided that sales for resale be made in strict compliance with the rules and regulations.* Any dealer making a sale for resale, which is not in strict compliance with the rules and regulations shall himself be liable for and pay the tax. A local collector shall accept a resale certificate issued by the Department of Revenue, provided the taxpayer includes the parish of its principal place of

5

business and local sales tax account number on the state certificate. However, in the case of an intra-parish transaction from dealer to dealer, the collector may require that the local exemption certificate be used in lieu of the state certificate. The department shall accommodate the inclusion of such information on its resale certificate for such purposes.

Thus, generally, items that are purchased for the purpose of reselling them in the open market are not taxed until they are sold at retail to the end consumer. There are numerous specific inclusions and specific exclusions or exemptions to the general rules.[6]

### *Further Processing Statute: La.R.S.47:301(10)(c)(i)(aa)*

Here, NISCO seeks to be exempt from paying sales tax on its $46 million purchase of sand and limestone by asserting that it did not use up the raw materials in manufacturing steam and electricity; rather, they were purchased for the purpose of resale because NISCO sold the ash that was created in the manufacturing process for $6.8 million. Specifically, NISCO invokes La.R.S. 47:301(10)(c)(i)(aa) which states, in full: *"The term 'sale at retail' does not include sale of materials for further processing into articles of tangible personal property for sale at retail."*

The Louisiana Secretary of Revenue has promulgated rules and regulations in La.Admin. Code tit. 61, pt. I, § 4301, entitled, "**Uniform State and Local Sales Tax Definitions**," which define the terms and phrases and provide examples for La.R.S. 47:301(1)–(27) "for illustration only [but] in no case should

---

[6]The taxing agencies assert that NISCO seeks an exemption from the only taxable component of its operation that remains because it already receives exemptions for: the petcoke it purchases to fuel its boilers pursuant to La.R.S. 47:305(D)(1)(d) and (h); the electricity and steam it sells pursuant to La.R.S. 47:305(D)(1)(b) and (d); the ash it sells for resale pursuant to La.R.S. 47:301(10)(a)(i); and, that most of NISCO's manufacturing equipment is exempt from local sales tax pursuant to La.R.S. 47:301(28).

they be construed to impose a limitation" on the statute. La.Admin.Code tit. 61, pt.

I, § 4301(C). Under § 4301(C) of the regulations, the definition of

"*Retail Sale* or *Sale at Retail—*," provides in pertinent part:

> a. The major tax levied by state and local sales or use tax is imposed upon retail sales or sales at retail which contemplates the taxing of any transaction by which title to tangible personal property is transferred for a consideration, whether paid in cash or otherwise, to a person for any purpose other than for resale.

> b. While specific exclusions are provided in R.S. 47:301(10) with respect to sales of materials for further processing into articles for resale and with respect to casual, isolated, or occasional sales, and exemptions are provided for sales of particular items or classes of property by R.S. 47:305 and R.S. 47:305.1 through R.S. 47:305.52, the intent of the law is to classify every sale made to the final user or consumer for any imaginable purpose, other than for resale, as a retail sale or a sale at retail. For purposes of R.S. 47:301(10), whether a transaction is exempt from taxation by statute, jurisprudence, or by constitution has no bearing on classification of the transaction.

> . . . .

> d. Sales of materials for further processing into articles of tangible personal property for subsequent sale at retail do not constitute retail sales. This exemption does not cover materials which are used in any process by which tangible personal property is produced, but only those materials which themselves are further processed into tangible personal property. Whether materials are further processed or simply used in the processing activity will depend entirely upon an analysis of the end product. Although any particular materials may be fully used, consumed, absorbed, dissipated or otherwise completely disappear during processing, if it does not become a recognizable and identifiable component which is of some benefit to the end product, it is not exempt under this provision. The fact that a material remained as a recognizable component of an end product by accident because the cost of removal from the end product was prohibitive or for any other reason, if it does not benefit the property by its presence, it was not material for

7

further processing and the sale is not exempt under this
provision.

The seminal cases interpreting the statute and the regulations are
*Traigle v. PPG Industries, Inc.*, 332 So.2d 777 (La.1976), and *Vulcan Foundry,
Inc. v. McNamara*, 414 So.2d 1193, 1196 (La.1981) (on rehearing). A three-
pronged test has developed to determine whether a manufacturer's purchase of raw
materials will be exempt from the sales and use tax under the "further processing"
statute. The raw materials, or their component molecular parts, (1) must be of
benefit to the end product; (2) must be a recognizable and identifiable component
of the end product; *and* (3) must have been purchased for the purpose of
reprocessing into the end product. *International Paper v. Bridges*, 07-1151 (La.
1/16/08), 972 So.2d 1121.

In *Traigle*, 332 So.2d 777, the Department of Revenue brought a
proceeding to collect sales and use taxes on graphite blades purchased by PPG for
use in its production of chlorine. The trial court found that taxes were due, and this
court reversed. The Louisiana Supreme Court reversed this court and reinstated
the trial court. Justice Tate held that graphite could not be regarded as having been
purchased for processing *into* the finished article because the raw material was not
an *integral* part of the end product. Justice Tate articulated as follows:

> The issue concerns the liability of the defendant
> chemical manufacturer for Louisiana sales/use taxes
> upon some five million dollars worth of graphite blades
> bought by it and used for the production of chlorine. The
> state Collector of Revenue sues to collect some one
> hundred thousand dollars of taxes allegedly due upon the
> purchase of this graphite.
>
> . . . .
>
> As we will state more fully below, the precise
> issue of tax law relates to whether, under a tax definition,

8

the graphite is used by the manufacturer as an ultimate consumer, as in the case of machinery or fuel (for which a sales/use tax is due when purchased by it); or whether, instead, the graphite is processed into the final product, so that the purchase of the latter, as the ultimate consumer, pays the tax (not the manufacturer).

*Id*. at 779.

In discussing the factual context of PPG's operations, Justice Tate explained:

> Chlorine is produced from salt water brine by an electrolytic process--i.e., the passage of electricity through a substance (the electrolyte) from a positive electrode or terminal (the anode) to a negative electrode or terminal (the cathode). In the present case, the electric current is passed through a salt water brine (the electrolyte) from the anode (the graphite blades here sought to be taxed, embedded in lead) to a cathode (a perforated steel screen, covered with asbestos). The passage of the electric current through the salt water brine breaks the salt water down into chlorine, hydrogen, and caustic soda, all saleable products.

> In the process, the graphite (carbon) blades of the anode and the asbestos of the cathode become unusable and must be replaced. The carbon anodes last about six months, and the asbestos diaphragms last about 150 days. (The steel and lead do not appreciably deteriorate through their use in the process.)

> The taxpayer no longer contends that the asbestos is exempt from taxation. However, essentially because a residue of the carbon (graphite) is found within the final chlorine product, the taxpayer claims that (all) the graphite is non-taxable material, as included within the manufactured product; rather than being a taxable material used by the manufacturer, as the ultimate consumer, during its production of the ultimate article sold by it to the consumer.

*Id*. at 779-80.

The court found the taxpayer's contention tenable because the literal wording of La.R.S. 47:301(10) permitted that, "if the substance used in the

9

manufacture enters into the final article produced for resale (however unintended or useless or minutely), the substance [could] be regarded as purchased for 'processing *into*' the article produced for sale[.]" *Id.* at 781. The court, however, concluded:

> Nevertheless, viewing the definition of La.R.S. 47:301(10) as a whole, the better or more reasonable interpretation, we believe, is that the substance cannot be regarded as purchased for processing "into" the finished article (and, thus, as non-taxable to the manufacturer), when in fact the "purpose" for which it is bought is not for incorporation "into" the manufactured product but rather only to be used in the process of producing the manufactured product for sale--at least where, as here, the inclusion of the waste residue of the substance results from an unintended (although unavoidable) inefficiency of the manufacturing process, is of no benefit to the product sold, and is of the nature of an impurity rather than of an integral part of the finished product.

*Id.*

In summary, the *Traigle* court found that carbon residue from graphite blades was identifiable in the chlorine produced by Traigle, but the trace residue was unintended and unavoidable waste. It was not integrated into or of any benefit to the chlorine, and the graphite used in the manufacturing process was not purchased for the purpose of resale or for further processing into the chlorine produced for sale.

In *Vulcan*, 414 So.2d 1193, the plaintiff manufactured manhole covers made of iron. The product standards required that the iron contain between 3.10 and 3.30 percent of carbon, which meant that, depending on how deficient the scrap iron was, carbon might have to be added during processing. As a heat source for melting the iron, Vulcan used coke which gives off carbon as it burns. Vulcan argued that its purchases of coke should be exempt from sales and use taxes

10

because its purpose in using coke was to process the carbon into the iron for sale at retail. The trial court found that two exemptions applied to Vulcan's purchases of coke: the further processing exclusion under La.R.S. 47:301(10), and the boiler fuel exemption under La.R.S. 47:305(4). The appellate court affirmed based upon the further processing exclusion alone. On original hearing, the Louisiana Supreme Court affirmed solely on the boiler fuel exemption. On rehearing, however, the Louisiana Supreme Court found that neither exemption applied.

In discussing the reprocessing exclusion of La.R.S. 47:301(10), the court determined that if the item was bought for further processing into items of tangible personal property for sale at retail, the item was exempt; but if the item was part of the manufacturing process, the manufacturer was the ultimate consumer, and the tax was owed. Based upon the testimony of a metallurgist, a chemist, and Vulcan's general manager, the court determined that using coke resulted in a net increase in carbon of less than one half of one percent, that there were other methods for adding carbon to the product, and that the addition of carbon through the use of coke was a secondary benefit. The court stated that, while the presence of carbon in the final product was "beneficial" to Vulcan, the "proper inquiry" was the "purpose" for which the coke was bought. *Id*. at 1198. Ultimately, the *Vulcan* court found that carbon, an element of the raw material coke, was identifiable and beneficial (but still only incidental) to the iron products that Vulcan manufactured; and the coke was purchased by Vulcan as a consumer for the purpose of heating scrap iron, not for further processing into an article for resale.

In *International Paper*, 972 So.2d 1121, the court found that three chemicals were exempt from the tax because they were purchased by a paper

11

manufacturer with the *purpose* of incorporating them into their white products. This conclusion was in spite of a contractual agreement that the chemicals were *primarily used* for bleaching and whitening the pulp that was then pressed into paper. The evidence indicated that the manufacturer chose the chemicals because they served as oxidizing agents; that the oxygen from the raw chemicals became a recognizable, identifiable, and integral part of the white paper products; and that the presence of the oxygen within the final products was not only beneficial to the products but also necessary to their production. In applying the criteria, each of the above courts examined the factual context of the manufacturer's process.

Here, NISCO was formed in an April, 28, 1988 partnership agreement, ("Partnership Agreement" or "Agreement") between Gulf State Utilities ("GSU," now known as "Entergy") and three other companies that had facilities in Lake Charles, Louisiana: Citgo, Conoco, and Vista (now, "Sasol"). The partnership was formed for the purpose of generating cost-effective electrical power for the three industrial partners and then selling the excess power to Entergy. The Agreement provided the partners' intent as follows:

> WHEREAS, the Industrial Participants want to stabilize electric power and energy costs by generating power in facilities which use the most economic fuel at any given time, including fuel coke, coal, refinery-product gas, or other fuels that may become available, and selling the resultant energy to GSU, and GSU desires to buy such energy; and

> WHEREAS, the Industrial Participants have expressed to GSU their intent to develop an electric power generation project to secure an electric energy supply for their operations in the Lake Charles, Louisiana area at the lowest practical stable cost; and

> WHEREAS, the Participants desire to establish a partnership to design, construct own, operate, and control electric power generating facilities; and

WHEREAS, GSU desires to sell energy to the Industrial Participants and certain of their subsidiaries in a manner so as to stabilize energy costs to the Industrial Participants and certain of their subsidiaries, and the Industrial Participants and certain of their subsidiaries desire to buy such energy[.]

The Partnership Agreement specifically set forth the purpose of the venture under its own heading, as follows:

**Purpose:**

The venture is created, and shall be conducted, for the purpose of designing, constructing, owning, operating, and controlling electric power generating facilities in the Lake Charles, Louisiana area, and producing electricity for sale to GSU and steam to supply all or a portion of the steam needs of the industrial facilities of the Industrial Participants in the Lake Charles Louisiana area, and conducting any activities related thereto or contemplated by this Agreement.

The parties to the 1988 Agreement initially began producing both electricity and steam using natural gas as fuel for the boilers. The Agreement indicated the partners' future intent to convert its facilities from natural gas technology to a "circulating fluidized boilers" (CFB) technology in order to lessen and stabilize their energy costs. The CFB technology incorporates the use of petroleum-coke ("petcoke") as fuel for the boilers. When petcoke is burned, it emits unacceptable levels of sulfur into the air, and the process is therefore regulated by the DEQ and the EPA. The use of limestone, considered a scrubbing agent, is required in order to capture the sulfur burning off of the petcoke. The limestone reduces the emission of sulfur into the air by 90%. After the limestone interacts with the petcoke, it produces a burnt residue, or by-product, called ash. This occurs when calcium carbonate from the limestone combines with the sulfur

from the petcoke to make calcium sulfate, the ash. The original Agreement provided for the eventual handling of the ash.

NISCO switched to the CFB technology in 1992. Initially, NISCO stored the ash on site at its facility and shortly thereafter located a buyer for the ash. By 1996, NISCO was selling all of its ash to LA Ash. LA Ash resells some of the ash in its original state and processes some of it into other products for resale for industrial, construction, environmental, and governmental applications.

As stated by the trial court, it is undisputed that the limestone did not appear in any form in the electricity produced and sold by NISCO. And NISCO does not contend that it purchased the limestone for further processing into steam and electricity. Rather, NISCO argues that the limestone does appear in and benefit the ash, and that NISCO intentionally purchased limestone for the additional purpose of manufacturing ash which it sells on the market as a third product. Essentially, NISCO's assigned errors concern the trial court's failure to apply each of the three criteria to the production of ash as a co-product. The taxing agencies argue that the ash is a residue, not a purposefully created product; that no manufacturer produces ash alone as a product; and that no business would spend $46 million on limestone to manufacturer ash that sold for only $6.8 million.

The testimony of Sandi Boyles, NISCO's business manager, reveals that the sand does not appear in the ash. The testimony of LA Ash President and CEO, Gary Livengood, and NISCO's own charts indicate that the valuable calcium in the limestone is essentially used up in absorbing the sulfur from the burning of the petcoke as fuel. The ash that remains is not re-used or reprocessed by NISCO, and NISCO does not collect sales tax from LA Ash when it "resells" the ash to LA Ash. LA Ash then resells the ash to tax-exempt governmental agencies for parking

14

lots and highways, and also to commercial establishments, some of which resell it again to their customers. It appears, then, that one of the ultimate consumers who finally pays the tax on NISCO's $46 million purchase of limestone is the neighbor John Doe who buys a sack of ash at Home Depot to put in the hole that he dug in his backyard in preparation of planting his new azalea bush.

With regard to NISCO's assertion that NISCO's payment of the tax on the limestone would result in double taxation, Justice Tate in *Traigle* stated as follows:

> The defendant taxpayer alleges that, to permit the tax on the graphite, is to permit double taxation, since a sales tax is collected on the chlorine from its ultimate purchaser. The contention overlooks the statutory scheme of taxing the ultimate consumer of the particular product purchased, in this case the manufacturer. The purchaser of the chlorine (who pays the sales tax thereupon, as *its* ultimate consumer) is no more the ultimate purchaser of the graphite anodes used up in the present electrolytic manufacturing process than he is of the lead components of the anode, or the steel cathodes and the used-up asbestos diaphragms which are components thereof, or the machinery used in the manufacture of the chlorine—all of which are likewise taxable to the manufacturer, as their ultimate consumer.

*Traigle*, 332 So.2d at 783 (emphasis added where underlined).

Similarly here, the ultimate consumer of the residual ash seems no more the purchaser of the $46 million in limestone than he is of the pet coke or other ingredients in NISCO's manufacturing process.

As to the benefit element of the analysis, the limestone is an integral part of the ash, but the evidence indicates that the precise makeup is accidental in that NISCO does nothing purposeful to affect the quality of the ash. In fact, it worked to keep the quantity of production of the ash down. More specifically, the deposition of Andrew Guinn, Sr., president of Port Aggregates, who supplied

between 225,000 and 250,000 tons of limestone to NISCO annually, reveals that the more calcium in the limestone, the more sulfur is absorbed from the petcoke, and the less limestone is required in the process for creating electricity. Consequently, there is less cost. The amount of sulfur in the petcoke varies, as does the calcium content in limestone. Thus, a blend was created that kept NISCO's process within DEQ and EPA regulations. Limestone from different quarries has varying amounts of calcium, and the limestone use is always adjusted to accommodate the sulfur content in the petcoke being used. E-mails between former NISCO business manager Sandi Boyles and senior management supervisor Dick Gooley, and copied to former operations manager Rick Zagar, indicate that the sale value of ash changes depending on the quality of the limestone. Other documentation indicates that much testing was done on the limestone for the production of electricity.

However, as to the "production" of ash, there was apparently no testing to determine how a particular quality limestone would impact the ash product. When current NISCO business manager Mitchell Todd Barnett was asked at trial to identify documents that addressed testing of the ash product, he could not locate any. Moreover, while less limestone meant lower costs for producing electricity, more limestone meant a greater production of ash. Yet, evidence indicated that NISCO wanted to produce less ash. Slides attached to Sandi Boyles' e-mail indicated that a power company in Alexandria was considering selling its ash for $2 to $3 dollars per ton, and that other power plants were paying ash companies to take their ash because it was cheaper than putting it in a land fill.

Regarding the purpose element of the analysis, NISCO points to the testimony of its business manager, Mr. Barnett, its site operations manager, Shelly

16

Hacker, and La Ash CEO, Mr. Livengood, confirming that NISCO had a dual purpose in purchasing the limestone and that the original Partnership Agreement provided for the future handling of ash at its facility. NISCO points to the *International Paper*, 972 So.2d 1121, case as support for its position that the purpose for which a raw material is purchased does not have to be the manufacturer's "primary" purpose. However, the second purpose of the three chemicals found exempt in *International Paper* had nothing to do with a secondary product. The only product at issue was the manufacturer's production of white paper products, and the white paper products were not a by-product of residue left over after the production of other products. The admonition of the second circuit by the supreme court in *International Paper* was that the intermediary court had misinterpreted *Traigle* and *Vulcan* to require that the *primary purpose* for the purchase of the material must be to process it into the end product, which was an unacceptable expansion of *Traigle* and *Vulcan*.

In *International Paper* there was actually a written agreement from the 1980's between the Department of Revenue and the majority of paper manufacturers, including *International Paper*, stating that the chemicals used in the manufacturer of white paper products were taxable because their primary purpose was bleaching and whitening the pulp, as opposed to the chemicals' incorporation into the final paper product. *International Paper* found that the chemicals *were* incorporated into the end product and made it clear that the primary stated purpose of bleaching the pulp in one step of the process did not foreclose the additional purpose of incorporating the chemicals into the final product when the pulp was pressed into paper.

The record does not support NISCO's argument that it purchased the limestone for the purpose of incorporating it into a co-product, the ash. In an email from NISCO's former business manager, Johnny Botley, to the school board's tax audit manager, Cathey Fetus, Mr. Botley stated (emphasis added):

> Sand is utilized in the NISCO process for injection into the circulating fluidized bed boiler along with petroleum coke and *limestone for the purpose of producing electricity for sale*.

The true nature of the ash as an incidental by-product that cannot be seen as co-product is evidenced in the original Partnership Agreement, which briefly provides for monitoring the volume and movement of the ash. It states on page 76 that income from the sale of ash will first be credited against the cost of power and energy generation. It then states that inventory will be assessed. "However, no value will be attributed to the inventory in the financial statements." The Agreement then states if the cost of disposing of the ash is expected to exceed the revenue from the sale of the ash, then the anticipated excess cost would be accrued to the financial statements.

Dr. Daryl Burckel, a tenured professor at McNeese State University, testified in the area of tax and cost accounting. He was experienced in business evaluation, financial analysis, and he had been a financial officer for industrial and construction companies. He essentially confirmed that NISCO did not treat the ash as a co-product. Dr. Burckel testified that in his review of over 900 pages of documents, he found no indication that NISCO performed any analysis to determine what impact changing the limestone would have on the ash product. By definition, he characterized the ash as an incidental by-product that was saleable, and he pointed out that the sale of the ash constituted less than one percent (1%) of

NISCO's sale of electricity. The ratio of electricity sales to ash sales in the taxable period was almost one hundred to one. Consequently, he stated that by definition the ash would be considered a by-product. Dr. Burckel testified that the purchase of the limestone was for the purpose of complying with DEQ and EPA permit requirements in controlling the sulfur emissions.

Upon being asked more than twenty times by NISCO's attorney at trial to agree that NISCO "also had a purpose and a will and an intent to make and sell ash," Dr. Burckel answered (emphasis added):

> A. Look. *Every one of those businesses are looking for every revenue stream that they can find; and just because they can find it doesn't mean that the purpose for which you buy a product changes.* The purpose for that product, that I keep coming back to, was to inhibit sulfur. Now, they found other ways in which to benefit their company from what was left over. And that is savvy business … looking constantly to drop down the cost of electricity to their partners.

Dr. Burckel's analysis under the purpose element of the three-prong test regarding taxability is in line with the jurisprudence. Faced with arguments similar to NISCO's herein, the supreme court in *Vulcan* stated as follows:

> *The fact that using coke as a fuel has a beneficial side effect does not change the purpose for which it is bought.* Accordingly, we conclude that Vulcan's purchase of coke is as a "consumer" for a "purpose other than for resale," that is, for its use as a heat source to melt scrap iron and not for further processing into an article of tangible property for sale at retail. Hence, the court of appeal erred in concluding that Vulcan is not liable for the sales/use tax on the coke purchased by it for use in the manufacture of "municipal castings" made of ACTM Class 30 gray iron. We must reverse.

*Vulcan*, 414 So.2d at 1199 (emphasis added).

Dr. Burckel further testified that the Partnership Agreement clearly stated that the purpose of the venture was constructing, owning, operating, and

19

controlling electric power generating facilities, without any mention of producing ash. He further testified that the Agreement's reference at the end of the "purpose" paragraph regarding "conducting any activities related thereto," harkened back to the purpose stated at the beginning of the paragraph, which was designing, constructing, owning, operating, and controlling the electric power generating facilities. He further indicated that the ash was considered an incidental by-product because, while its production could be anticipated and planned for, the relative sales value rendered it incidental; and because "no one would undertake a production process with the sales of the byproduct alone."

Sandi Boyles, NISCO'S business manager, was asked this precise question:

> Q. Would you purchase limestone to manufacture and sell ash if you didn't have the electricity to sell?
>
> A. That's not our business.
>
> Q. Okay, I understand that. I understand that's not your business. My question to you is: Would you or anybody construct a facility to purchase limestone for the sole purpose of producing ash and reselling ash.
>
> A. No.

Ms. Boyles' testimony further contained the following colloquy:

> Q. Let's assume that you no longer can get anybody to pay you for the ash, okay, but they're willing to come and pick it up for free. So that basically the ash is taken off your hands, you don't pay anything, but you don't receive any revenue from it. You understand?
>
> A. Yes.
>
> Q. But you still need to generate electricity and generate that, roughly, 195 million dollars a year in revenue you're getting from electricity. Would you still buy the limestone?

A. More than likely, yes.

Based upon the evidence in the record, NISCO's contentions regarding the purchase of limestone for the purpose of producing ash do not survive a full analysis under the test enunciated in *International Paper* as developed through its predecessors, *Traigle* and *Vulcan*. Accordingly, we affirm the trial court's judgments finding that NISCO's purchases of sand and limestone are subject to sales and use tax, and not exempt or excluded under the further processing statute.[7]

### *Attorney Fees*

NISCO contends that the trial court erred in failing to award NISCO attorney fees in its suit no. 2013-2661 against the Parish. Louisiana Revised Statutes La.R.S. 47:337.13.1(B)(1) provides that "the prevailing party in a dispute, contest, or other controversy involving the determination of sales and use tax due shall be entitled to reimbursement of attorney fees and costs, not to exceed ten percent of the taxes, penalties, and interest at issue . . . ." Because NISCO is not the prevailing party, this issue is moot.

### *Penalties*

NISCO contends that the trial court erred in imposing penalties against NISCO in both of NISCO's suits against the Parish, nos. 2010-3564 and 2013-2661, asserting that NISCO's failure to pay the taxes timely was based upon a good faith belief that the purchases were excluded from taxation. Louisiana

---

[7]As seen in the above jurisprudence and the department of revenue's regulations, the further processing statute has been referred to as both an exemption and an exclusion. We do not find it necessary to address NISCO's arguments regarding whether the statute should be treated as an exemption or an exclusion for the reasons expressed by Justice Al Tate in *Traigle v. PPG Industries*, 332 So.2d 777.

Revised Statutes 47:337.71 of the Uniform Local Sales Tax Code (ULSTC) provides:

> If the failure to make any return at the time such return becomes due or the filing of a return without remittance of the full amount due is attributable not to the negligence of the taxpayer, but to other cause set forth in written form and considered reasonable by the collector, the collector may remit or waive payment of the whole or any part of the specific penalty provided for such failure.

NISCO argues that the ULSTC applies and takes the opposition to task for its citation of pre-2003/ULSTC cases; then NISCO itself proceeds to cite cases from 1986 through 2002. According to the clear wording of the above statute, waiver of the penalty is in the province of the collector, and it is permissive, not mandatory. We find no merit in NISCO's position.

V.

## CONCLUSION

Based upon the foregoing, we affirm the trial court judgments rendered on June 2, 2014, in these four consolidated cases. Costs of this appeal are assessed against NISCO.

**AFFIRMED**.

No. 14-1250, (c/w) No. 14-1251, (c/w) No. 14-1252, (c/w) No. 14-1253

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA


No. 14-1250; Cynthia Bridges, Sec. Dept. of Rev., State of Louisiana v. Nelson
Industrial Steam Co.

(c/w)

No. 14-1251; Nelson Industrial Steam Co. v. Calcasieu Parish School System Sales
and Use Tax Dept., et al.

(c/w)

No. 14-1252; Cynthia Bridges, Sec. Dept. of Rev., State of Louisiana v. Nelson
Industrial Steam Co.

(c/w)

No. 14-1253; Nelson Industrial Steam Co. v. Calcasieu Parish School System Sales
and Use Tax Dept., et al.


CONERY, J., dissenting.

The central issue in these four consolidated cases is whether NISCO's

purchase of limestone used in its manufacture of electricity, steam, and ash should

be **excluded** from sales tax pursuant to La.R.S. 47:301(10)(c)(i)(aa), expressly

referred to by the supreme court as the "further processing **exclusion**." *Int'l Paper

Inc. v. Bridges*, 07-1151 (La. 1/16/08), 972 So.2d 1121, 1128. The statute at issue

providing for the **exclusion** states, "The term 'sale at retail' **does not include sale

of materials for further processing into articles of tangible personal property

for sale at retail**." La.R.S. 47:301(10)(c)(i)(aa) (emphasis added). Because a tax

**exclusion** is at issue, the statute must be liberally construed in favor of the taxpayer

and against the State (LDR) and Parish (CPSS), herein collectively referred

textually as "Tax Collectors." *Harrah's Bossier City Inv. Co., LLC v. Bridges*, 09-

1916 (La.5/11/10), 41 So.3d 438. The trial court and majority incorrectly interpreted the law as though the **exclusion** in question was a tax exemption and construed the "exemption" narrowly in favor of the Tax Collectors. I submit their decisions were wrong as a matter of law and respectfully dissent.

For many years prior to the audits at issue, the Tax Collectors treated limestone used in NISCO's manufacturing process to reduce sulfur emissions in the production of electricity, steam, and ash as a raw material subject to the further processing exclusion, thus excluding NISCO's purchase of limestone from sales tax. The CFB technology employed by NISCO in its manufacture of electricity, steam, and ash required the use of limestone and was contemplated by NISCO from the inception of its April 28, 1988 partnership agreement for production of those products. NISCO's facility was converted from natural gas to the CFB technology it now uses in 1992, as originally planned. That technology incorporates the use of petcoke as opposed to natural gas as fuel for the boilers used in the process. As correctly noted by the majority, limestone is required to reduce the emissions of sulfur from the petcoke burned in the boilers as fuel, and in the process, the limestone is simultaneously processed into an ash. The ash is the result of a combination of the carbon and oxygen from the limestone and the sulfur from the petcoke, which results in a mixture of calcium oxide and calcium sulfate ash. There is a ready market for the ash, one of the products to be sold as planned from the beginning. Neither the CFB technology, nor the law applicable to the further processing exclusion, La.R.S. 47:301(10)(c)(i)(aa), has changed since 1992. What did change was the decision by the Tax Collectors in this case to tax the limestone used in the manufacturing process beginning with audits dating back to the tax year 2005.

2

The trial court in its judgment, and cryptic reasons for ruling, affirmed by the majority, found, "It is also undisputed that limestone in any form, or its component parts, is not found in the steam and electricity produced" by NISCO. The trial court further stated, "Just because the ash is an incidental byproduct of the [CFB] process, its production, even in combination with the production of steam and electricity, does not in and of itself permit NISCO to claim the benefit of the further processing tax exclusion on its purchase of limestone."

Respectfully, the trial court and majority misconstrued the law applicable to a tax **exclusion** in this case. In affirming, the majority states, "Here, NISCO seeks to be **exempt** from paying sales taxes on its $46 million purchase of sand and limestone[.]" To the contrary, it is the Tax Collectors who are bringing this suit and the Tax Collectors who must bear the burden of establishing that the raw materials used in NISCO's manufacturing process are not subject to the tax **exclusion** provided by the legislative act in question. This case, essentially, is about statutory construction.

The trial court and the majority have determined that since the ash, one of the three products produced in the manufacturing process and sold by NISCO, is not the **primary product** sold by NISCO, and is not as economically profitable as electricity and steam, then the limestone purchased by NISCO and required to be used in its process is not subject to the further processing exclusion and is subject to sales tax. The undisputed record, however, supports NISCO's argument that NISCO always contemplated sale of the ash as one of the products produced for resale, along with electricity and steam, and continued to develop its market for its ash product. Since 1996 through today, NISCO has sold 100% of its ash output to LA Ash. According to the record, it is estimated that NISCO sells approximately

3

600-800 pounds of ash daily and some 200,000 to 250,000 tons annually.  Ash is

clearly more than just a "by product" of NISCO's manufacturing process.  It is

especially clear, and not subject to dispute, that ash is one of the product**s,** plural,

produced for resale in the manufacturing process, though admittedly, not the

**primary** or most profitable product.

*Statutory Interpretation*

In *McLane Southern, Inc.*, 11-1141, pp. 5-7 (La. 1/24/12), 84 So.3d 479, 483,

the Louisiana Supreme Court succinctly stated the requirements for the judicial

interpretation of statutes:

> "It is a fundamental principle of statutory interpretation that
> when a 'law is clear and unambiguous and its application does not
> lead to absurd consequences, the law shall be applied a written, and no
> further interpretation may be made in search of the intent of the
> legislature.'" *Harrah's Bossier City Inv. Co., LLC v. Bridges*, 09-
> 1916 (La.5/11/10), 41 So.3d 438, 446-447 (citing La. C.C. art. 9).
> This principle applies to tax statutes. *Cleco Evangeline, LLC v.
> Louisiana Tax Com'n*, 01-2162 (La.4/3/02), 813 So.2d 351, 354;
> *Tarver v. E.I. Du Pont De Nemours and Co.*, 93-1005 (La.3/24/94),
> 634 So.2d 356, 358.  When the law is not clear and unambiguous or
> its application leads to absurd consequences, we must rely on the
> secondary rules of statutory interpretation to discern the meaning of
> the statutes at issue.  *Id.*  The fundamental question in all cases of
> statutory interpretation is legislative intent and the ascertainment of
> the reason or reasons that prompted the Legislature to enact the law.
> *Pumphrey v. City of New Orleans,* 05-0979 (La.4/4/06), 925 So.2d
> 1202, 1210 (citing *In re Succession of Boyter*, 99-0761 (La.1/7/00),
> 756 So.2d 1122, 1128).  The rules of statutory construction are
> designed to ascertain and enforce the intent of the Legislature.  *Id.;
> Stogner v. Stogner*, 98-3044 (La.7/7/99), 739 So.2d 762, 766.

> The meaning and intent of a law is determined by considering
> the law in its entirety and all other laws on the same subject matter
> and placing a construction on the provision in question that is
> consistent with the express terms of the law and with the obvious
> intent of the Legislature in enacting it.  *Pumphrey, supra* at 1210
> (citing *Boyter, supra* at 1129; *Stogner, supra* at 766).  The statute
> must, therefore, be applied and interpreted in a manner, which is
> consistent with logic and the presumed fair purpose and intention of
> the Legislature in passing it.  *Id.* (Citing *Boyter, supra* at 1129.)  This
> is because the rules of statutory construction require that the general

4

intent and purpose of the Legislature in enacting the law must, if possible, be given effect. *Id.* Courts should give effect to all parts of a statute and should not give a statute an interpretation that makes any part superfluous or meaningless, if that result can be avoided. *Id.* It is likewise presumed that the intention of the legislative branch is to achieve a consistent body of law. *Id.* (Citing *Stogner*, *supra* at 766).

Tax exclusions are to be liberally construed in favor of the taxpayer and strictly construed against the taxing authority. In *Harrah's*, the supreme court explained the difference between a tax exemption and a tax exclusion as follows:

> According to the leading Louisiana sales tax treatise, a "tax exemption is a provision that exempts from tax a transaction that would, in the absence of the exemption, otherwise be subject to tax. That is, there has been a statutory decision not to tax a certain transaction that is clearly within the ambit and authority of the taxing statutes to tax." Bruce J. Oreck, *Louisiana Sales & Use Taxation* (2d ed.1996), § 3.1. An exclusion, on the other hand, "relates to a transaction that is not taxable because it falls outside the scope of the statute giving rise to the tax, *ab initio.* Transactions excluded from the tax are those which, by the language of the statutes, are defined as beyond the reach of the tax." *Id.* Oreck's definitions have been widely adopted by Louisiana courts.

*Harrah's*, 41 So.3d at 446 (footnote omitted).

Our courts have continued to apply the principle of statutory construction that, "Taxing statutes must be strictly construed against the taxing authority; where a tax statute is susceptible of more than one reasonable interpretation, the construction favorable to the taxpayer is to be adopted." *Cleco Evangeline, LLC, v. La. Tax Com'n*, 01-2162, p. 8 (La. 4/3/02), 813 So. 2d 351, 356.

Therefore, the task of the trial court was to apply the law as stated by the legislature and enlightened by the jurisprudence interpreting Louisiana's taxation of goods sold at retail.

*Applicable Law*

Louisiana Revised Statutes 47:302(A) states in pertinent part, "There is hereby levied a tax upon the **sale at retail**, the use, the consumption, the distribution, and the storage for use or consumption in this state, of each item or article of tangible personal property, as defined herein." (Emphasis added.)

The definition for "sale at retail" is found in La.R.S. 47:301(10)(a)(i), which provides, in pertinent part, "Solely for the purposes of the imposition of the state sales and use tax, "retail sale" or "sale at retail" means a sale to a consumer or to any other person for any purpose **other than for resale as tangible personal property**. (Emphasis added.)

As previously indicated, La.R.S. 47:301(10)(c)(i)(aa), expressly referred to as the "**further processing exclusion**," further clarifies, "The term 'sale at retail' **does not include sale of materials for further processing into articles of tangible personal property for sale at retail**." (Emphasis added.) *Int'l Paper Inc.*, 972 So.2d at 1128.

Under either statute, the ash in this case is clearly a product manufactured for resale as tangible personal property.

The regulations adopted by the Department of Revenue also require that the Tax Collectors give a broad or liberal interpretation in favor of the taxpayer. Louisiana Administrative Code, Title 61, Part I, § 4301 entitled, "Uniform State and Local Sales Tax Definitions**,"** provides under section 4301(A) in pertinent part:

> A. General. Words and phrases shall be read with their context and the specific section of law to which they are applicable. They shall be construed according to the common usage of the language. **Technical words and phrases, and such others as may have acquired a peculiar meaning in the field of taxation shall be construed according to such peculiar meaning**.

6

(Emphasis added.)

Louisiana Administrative Code, Title 61, Part I, § 4301(C) further provides under the definition of "*Retail Sale or Sale at Retail*" the following:

> d. **Sales of materials for further processing into articles of tangible personal property for subsequent sale at retail do not constitute retail sales.** This exemption does not cover materials which are used in any process by which tangible personal property is produced, but only those materials which themselves are further processed into tangible personal property. Whether materials are further processed or simply used in the processing activity will depend entirely upon an analysis of the end product. Although any particular materials may be fully used, consumed, absorbed, dissipated, or otherwise completely disappear during processing, if it does not become a recognizable and identifiable component which is of some benefit to the end product, it is not exempt under this provision. The fact that a material remained as a recognizable component of an end product by accident because the cost of removal from the end product was prohibitive or for any other reason, if it does not benefit the property by its presence, it was not material for further processing and the sale is not exempt under this provision.

(Emphasis added.)

Clearly, the ash produced in this case also meets the definition contained in the regulation, tangible personal property for subsequent sale at retail. *See* La.R.S. 47:301(10)(c)(i)(aa). There is no "primary purpose test" or "economic benefit test" in either the statute or regulation. The controlling supreme court jurisprudence requires a liberal interpretation in favor of the taxpayer and specifically rejects the "primary purpose" test espoused by appellees. *See Int'l Paper*, 972 So.1121; *Harrah's*, 41 So.3d at 438.

In *International Paper,* the supreme court stated that, "'Sale at retail' under La.R.S. 47:301(10)(a)(i) can take on different meanings, depending upon the taxing authority involved and/or the product(s) being sold." *Int'l Paper*, 972 So.2d at 1128. The supreme court then conducted an exhaustive review of the history of

7

the "further processing exclusion." *See* La.R.S. 47:301(10)(c)(i)(aa). The issue in *International Paper* involved a process called "short sequence bleaching," in which chemicals or raw materials were used to bleach the brown color from pulp in order to produce a lighter color suitable for certain paper production. The chemicals or "Raw Materials" used in the bleaching process were sodium chlorate, hydrogen peroxide, and elemental oxygen. *See Int'l Paper*, 972 So.2d 1121. The Board of Tax Appeals found in favor of International Paper and excluded all of the "Raw Materials" from taxation based on the further processing exclusion, as those "Raw Materials" were used in the eventual production of the lighter colored paper products it sold. The second circuit reversed on appeal, finding that a further test, the "**primary purpose** test" had to be applied. See *Int'l Paper*, 972 So.2d at 1126-27.

The supreme court then reversed the appellate court and held:

> We find that the appellate court correctly determined that the "further processing exclusion" applies to those raw materials becoming recognizable and integral parts of the end products, while at the same time, the raw materials subject to the tax exclusion must be beneficial to the end products. However, our review of the applicable law and jurisprudence does not suggest that the raw materials *themselves i.e.*, the exact chemical/physical compositions of the raw materials) must appear in the end products, **nor does the law suggest that the *primary* purpose for the purchase of these raw materials must be their incorporation into the end products**.

*Id.* at 1133 (emphasis added).

In *International Paper*, the supreme court then concluded that the inclusion of a primary purpose analysis applied by the appellate court was an improper expansion of its prior rulings in *Traigle v. P.P.G. Ind. Inc.*, 332 So.2d 777 (La. 1976) and *Vulcan Foundry, Inc. v. McNamara*, 414 So.2d 1193 (La. 1982):

> To be excluded from the sales and use tax provisions, we also agree that the raw materials must be purchased with the *purpose* of

8

incorporating said materials into the end products (*i.e.,* the raw materials are "material for further processing"); however, in the instant case, the appellate court found that, to be excluded from taxes, the raw materials must have been purchased for the *primary* purpose of incorporation into the end products.

. . . .

The appellate court appears to have expanded upon our holdings in the aforementioned cases, as neither the *Traigle* Court, nor the *Vulcan* Court, suggested that a "***primary*** purpose" test was required. Rather, both the *Traigle* and *Vulcan* Courts recognized the necessity of a "purpose" test.

. . . .

Accordingly, to be excluded from sales and use tax, we find that the raw materials must have been purchased for the *purpose of incorporation* within the end products, as the raw materials must be ***material for the further processing*** of the final products produced.

*Int'l Paper*, 972 So.2d at 1135 (footnotes omitted) (emphasis in original).

In *International Paper*, the supreme court specifically found that the application of the further processing exclusion **does not** require that "the exact chemical/physical compositions of the raw materials[] must appear in the end products, nor does the law suggest that the *primary* purpose for the purchase of these raw materials must be their incorporation into the end products." *Int'l Paper*, 972 So.2d at 1133. The supreme court in *International Paper* reaffirmed the three-part test from its prior rulings, and specifically rejected the **primary purpose** test utilized by the appellate court in that case in its ruling. *See Int'l Paper*, 972 So.2d 1121.

Notably, the supreme court in *International Paper* specifically used the word "products," plural, in discussing the "further processing exclusion," and stated, "Accordingly, to be excluded from sales and use tax, that the raw materials must have been purchased for the *purpose of incorporation* within the **end products**, as the raw materials must be ***material for the further processing*** of the **final**

9

**products produced**." *Int'l Paper*, 972 So.2d at 1135 (second emphasis added).

NISCO's manufacturing process produces three products, electricity, steam, and

ash, and buys and uses limestone as a necessary component to produce those final

three products.

The supreme court in *Tin, Inc. v. Washington Parish Sheriff's Office*, 12-

2056 (La. 3/19/13), 112 So.3d 197, n. 2 (citations omitted), again applied the three

part test adopted in *International Paper* in connection with the further processing

exclusion referenced in La.R.S. 47: 301(10)(c)(i)(aa), and stated:

> This Court has held that raw materials further processed into end
> products are excluded from this sales and use tax provision if: (1) the
> raw materials become recognizable and identifiable components of the
> **end products**; (2) the raw materials are beneficial to the **end
> products**; and (3) the raw materials are material for further processing,
> and as such, are purchased with the purpose of inclusion in the **end
> products.** *See International Paper, Inc. v. Bridges*, 07-1151
> (La.1/16/08), 972 So.2d 1121, 1136.

(Emphasis added.)

Again, the supreme court used the word **products,** plural. It is clear from

the supreme court's decisions in *International Paper* and *Tin, Inc.*, that products

purchased for sale at retail are deemed to be an *exclusion* from the imposition of

sales taxes. Further, a tax exclusion such as this one at issue is to be "construed

liberally in favor of the taxpayers and against the taxing authority" as found in

Harrah's, 41 So.3d at 446. A tax *exemption*, on the other hand, is "strictly

construed in favor of the State and 'must be clearly and unequivocally and

affirmatively established' by the taxpayer." *Id*. at 446. In this case, we are by

supreme court definition dealing with a tax *exclusion*.

The Tax Collectors also argue that NISCO's cost for the purchase of the

limestone far outweighs the sale of the end product, the ash, on the retail market,

the "economic benefits argument." Therefore, the further processing exclusion, for economic reasons, should not apply to NISCO's purchase of limestone. Though an excellent point, such policy arguments should be presented to the legislature so that the tax **exclusion** provided for by the statute may be narrowed and further defined by that body. In *International Paper*, 972 So.2d at n. 13, the supreme court recognized that the legislative intent was made clear:

> It is interesting to note that during the Legislature's 2007 Regular Session, a Senate Concurrent Resolution was adopted, which resolution addressed the proper interpretation of the "further processing exclusion." Senate Concurrent Resolution No. 136 states, in pertinent part:
>
> WHEREAS, many states do not tax any chemicals or other property required for the manufacturing of property for resale; and
>
> WHEREAS, deviations from the three prong test make the taxability of property required for manufacturing in Louisiana uncertain and undermine the efforts of Louisiana to attract additional investment dollars to the state.
>
> THEREFORE, BE IT RESOLVED that the Legislature of Louisiana does hereby urge and request the secretary of revenue to:
>
> (1) Recognize the interpretation of R.S. 47:301(10)(c) that has been long recognized by Louisiana courts and embrace the three prong test for the non-taxability of further processing materials, to wit: materials are nontaxable materials for further processing if (i) the material or its components become an identifiable component of the product, (ii) the material or its components are beneficial to the end product, and (iii) the presence of the material in the end product is not incidental.
>
> (2) Adopt regulations consistent with such interpretations.
>
> (3) File pleadings consistent with such interpretations in court proceedings concerning the interpretation of R.S. 47:301(10)(c)(i)(aa).

Since the legislative resolution and the supreme court decision in 2008, the legislature has met eight times, including this year, when the legislature was especially active in seeking additional revenue sources. The legislature has not chosen to amend La.R.S. 47:301(10)(c)(i)(aa) to add the **primary purpose** test or

11

an "economic benefit test," or otherwise narrow the further processing tax **exclusion** in any way. We must apply the further processing exclusion broadly in favor of the taxpayer and against the taxing authorities. The trial court and the majority failed to do so and, in my view, committed legal error as to a matter of statutory interpretation. This court must interpret the statute in accordance with legislative intent and long standing court precedent, recognizing that tax exclusions must be "construed liberally in favor of the taxpayers and against the taxing authority," *Harrah's*, 41 So.3d at 446. A careful reading of La.R.S. 47:301(10)(c)(i)(aa) and La.Admin.Code tit. 61, pt. I, § 4301 reveals that neither the statute nor the Secretary's regulation contain any such restrictions espoused by appellees and approved by the trial court and the majority.

I dissent from the majority's decision to judicially interpret the controlling statute and regulation in such a narrow and restrictive manner contrary to legislative intent and settled supreme court precedent.

## CONCLUSION

I would reverse the June 2, 2014 judgments of the trial court in favor of Cynthia Bridges, Secretary of the Department of Revenue for the State of Louisiana, against Nelson Industrial Steam Company in Docket Nos. 14-1250 and 14-1252.

I would also reverse the trial court's June 2, 2014 judgments in favor of the Calcasieu Parish School System Sales and Use Tax Department, in Docket Nos. 14-1251 and 14-1253 and order the Calcasieu Parish School System Sales and Use Tax Department, as Central Collector of Sales/Use Tax for the Parish of Calcasieu, and Rufus Fruge in his capacity as Administrator of the Calcasieu Parish School

System Sales and Use Tax Department, to refund the taxes, penalties, and interest

paid under protest by Nelson Industrial Steam Company in the following amounts:

> District court no. 2010-3564: $911,683.79 tax; $227,921.01 penalty; and $271,162.18 interest through July 12, 2010 (the date of payment under protest), plus accrued legal interest thereon until the date of refund, pursuant to La. R.S. 47:337.63(A)(3).

> District court no. 2013-2661: $1,076,032.73 tax; $269,008.29 penalty and $275,788.58 interest through May 13, 2013 (the date of payment under protest), plus accrued legal interest thereon until the date of refund, pursuant to La. R.S. 47:337.63(A)(3).

Costs on appeal should be assessed to the Calcasieu Parish School System

Sales and Use Tax Department, as Central Collector of Sales/Use Tax for the

Parish of Calcasieu, and Rufus Fruge in his capacity as Administrator of the

Calcasieu Parish School System Sales and Use Tax Department pursuant to La.R.S.

13:5112. Costs on appeal should not be assessed against the Louisiana Department

of Revenue in accordance with La.R.S.13:4521.

.