CLARK, J.
| kelson Industrial Steam Company (“NISCO”) is in the business of generating electric power in Lake Charles, Louisiana. As part of its venture, NISCO sells multi-pie products:- steam, electricity and ash. Limestone is bought- and used for the dual purpose of inhibiting sulfur in the production of electricity and producing ash. NISCO asserts its purchase of limestone, with respect to its production of ash, is subject to the “further processing exclusion” of La. R.S. 47:301(10)(c)(i)(aa), which narrows the scope of taxable sales.[1] We granted NISCO’s writ application to determine the taxability of the limestone. To resolve this issue, we determined that the dual purpose for the raw material could be considered and a by-product could be analyzed as the encl product when ^ascertaining the purpose for which the limestone was bought. For the reasons that follow, we reverse the lower courts and rule in favor of NISCO.
FACTUAL AND PROCEDURAL BACKGROUND
In 1988, Gulf State Utilities (now “En-tergy”), Citco, Conoco, and Vista (now “Sa-sol”) entered into a partnership (known as “NISCO”) to own, construct, design, and control electric power generating facilities in Lake Charles, Louisiana. Originally, NISCO used natural gas to produce electricity and steam, but it ultimately converted to “circulated fluidized boilers” (CFB) technology, which uses petroleum-coke (“petcoke”) as fuel for the manufacturing of the electricity and steam. The CFB technology causes sulfur emissions. In order to comply with state and federal environmental regulations, NISCO introduces limestone into the process, which ácts as a sulfur inhibitor, or a “scrubbing agent.” Additionally, and simultaneously, the limestone chemically reacts with the sulfur to make ash, which NISCO then sells to LA Ash, for á profit of roughly $6.8 million *278 annually. LA Ash sells the ash to its customers for varying commercial purposes, including roads, construction projects, environmental remediation, etc.
In light of the limestone being further processed into ash and then sold, NISCO views the purchase of this raw material as subject to the “further processing exclusion” and, thus, untaxable. Accordingly; it did not pay sales tax on its purchase of limestone. The Louisiana Department of Revenue and the Calcasieu Parish School System, (collectively the “Tax Collectors”), did not tax the purchase of the limestone for many years.' However, they now argue the limestone is taxable and not subject to any exclusion. The competing positions resulted in four consolidated cases concerning the collection of sales tax on NIS-CO’s purchase of limestone for the tax periods of 2006-2007, 2007-2009, 2008-2012, and 2010-2012.[2] ' ‘
|sThe trial court considered competing motions for summary judgmént and'granted the Tax Collectors’ motion. The court of appeal affirmed.[3] This court reversed, finding genuine issues of material fact remained.[4] A two-day trial ensued, and the trial court again ruled in favor of the Tax Collectors, finding the limestone to be taxable. In its reasons for judgment, the trial court explained:
It is indisputable that the [CFB] technology process NISCO employs in its production of steam and electricity requires the use of limestone. And, unavoidably, also produces ash, which it sells — NISCO sells. • It is also indisputable that limestone in any form, or its component parts, are not found in the steam and electricity produced. Just because the ash is an incidental byproduct of the [CFB] process, its production, even in combination with the production of steam and electricity, does not in and of itself permit NISCO to claim the benefit of the further processing tax exclusion of its purchase of limestone.
The court of appeal affirmed, giying particular emphasis to the nature of the ash as an incidental by-product, which generated only 1% of NISCO’s sale of electricity, and finding the purpose of the venture (and the accompanying purchase of the limestone) was to produce electricity.[5] Judge Connery dissented, observing the “further processing provision” is a tax exclusion, which is to be liberally construed in favor of the taxpayer. Further, Judge Connery noted the majority improperly placed the burden on NISCO to prove entitlement to the exclusion when it should have been placed on the' Tax Collectors to establish that the exclusion did not apply.
NISCO filed a writ application, which this court granted to determine the applicability of the “further processing exclusion” to the limestone at issue.[6]
STANDARDS OF REVIEW
A court of appeal may not set aside a trial court’s or a jury’s finding of fact 14in the absence of “manifest error” or *279 unless it is “clearly wrong.”[7] However, when reviewing courts find that a reversible error of law was made in the lower court, appellate courts are required to redetermine the facts de novo from the entire record and render a judgment on the merits.[8]
As our discussion below will illustrate, the purpose for which the raw material is purchased is an important inquiry in determining the availability of the “further processing exclusion.” The Tax .• Collectors contend that the lower courts’ determination regarding the purpose for the 'purchase of the limestone is a factual finding, subject to the manifest error standard of review. While this is a tenable argument, a deeper look at the trial court’s reasons for ruling and the court of,appeal’s affirmation thereof, reveals an error in their legal analysis, requiring this court to conduct a de novo review of the record. Namely, we find the lower courts committed legal error in narrowing their analysis solely to the end product of electricity and not considering the end product of ash, thereby interjecting a “primary^ product” test (or alternatively, a “business purpose” test), which is not rooted in. any statutory, regulatory, or jurisprudential authority. Further, we find the lower courts imposed, perhaps in a veiled manner, a “primary purpose” test, which has previously been jurisprudentially rejected, as will be discussed later. Accordingly, we will conduct a de novo review. „
DISCUSSION
Generally, sales taxes are levied on articles of tangible personal property. La. R.S. 47:302 provides:
There is hereby levied a tax upon sale at retail, the use, the consumption, the distribution, and the storage for use or consumption in this state, of each item or article of tangible personal property, as defined herein ...
.La.'R.S. 47:301(10j(a)(i) defines “sale at retail” as “a sale to a consumer to Rany other person or for any purpose other than for resale as tangible personal property.” By statutory exclusion, the term “sale at retail” does not include “sales of materials for further processing 'into articles' of tangible personal property.” La. R.S 47:301(l)(a)(i)(c)(i)(aa). Thus, resolution of this matter depends' entirely on the interpretation of this “further processing exclusion.”
When a law is clear and unambiguous and its application does not lead to absurd consequences, no further search into the legislative intent is permitted or required.[9] However, the jurisprudential test, created over the last few decades, which was necessitated by litigation concerning the exclusion’s scope, and the regulation promulgated by the Louisiana Department of Revenue,[10] which was drafted to aid in deciphering the meaning of the “further processing exclusion,” clearly evidence inherent ambiguity in the provision. Thus, we look to our rules of statutory construction for guidance. In Harrah’s Bossier City Inv. Co., LLC v. Bridges, 09-1916, pp. 9-10 (La.5/11/10), 41 So.3d 438, 446, this court explained the difference between a tax exclusion and a tax exemption, and the opposing legal maxims that accompany them:
Unfortunately, the Legislature has not provided a statutory definition of either an “exemption” or an “exclusion.” *280 ■According to the leading Louisiana sales tax treatise, a “tax. exemption is a provision that exempts from tax a transaction that would, in the absence of the exemption, otherwise be subject to tax. That is, there has been a statutory decision not to tax a certain transaction that is clearly within the ambit and authority of the taxing statutes to tax.”, Bruce J. Oreck, Louisiana Sales , & Use Taxation (2d ed.1996), § 3.1. An exclusion, on the other hand, “relates to a transaction that is not taxable because it falls outside the scope of the statute giving rise , to the tax,, ab initio. Transactions excluded from the tax are those which, by the language of the statutes, are. defined as beyond the reach of the tax.” Id. Oreck’s definitions have been widely ‘ adopted by Louisiana courts.
There' are also two seemingly contradictory jurisprudential hiaxims at play. Tax exemptions are strictly construed in favor of the State and “must be clearly and unequivocally and affirmatively ^established” by the taxpayer. Vulcan Foundry, Inc. v. McNamara, 414 So.2d 1193, 1197 (La.1982). Exclusions, on the other hand, are “construed liberally in favor of the taxpayers and against the taxing' authority.” Wyesco of Louisiana, LLC v. East Feliciana Parish School Board, 2000-1322, p. 5 (La.App. 1 Cir. 9/28/01), 809 So.2d 401, 404, citing Tarver v. World Ship Supply, Inc., 615 So.2d 423, 426 (La.App. 4 Cir.1993), writ denied, 616 So.2d 672 (La.1993). [Footnotes omitted].
The majority’s opinion in Traigle v. PPG Industries, Inc., 332 So.2d 777, 782 (La.1976), which included the first major examination of the “further processing exclusion,” acknowledged these principles of statutory construction, but declined to specify which was applicable and avoided categorizing the provision. It. looked, instead, to legislative intent as the ultimate “aim of all of these principles.”[11]
Although the “further processing exclusion” is deemed neither an exclusion nor an exemption in the statute itself, as we stated in Harrah’s Bossier City, 41 So.3d at 450:
There are no “magic words” necessaty .to create ah exemption or an exclusion; the determining factor is the effect of the statute: “the words and form used legislatively in-granting an exemption are not important if, in their essence, the Legislature creates an exemption.” Wooden v. Louisiana Tax Commission, 94-2481 (La.2/20/95), 650 So.2d 1157, 1161, citing Meyers v. Flournoy, 209 La. 812, 25 So.2d 601 (1946). [Emphasis added].
This court has determined the “further processing exclusion” was designed “to eliminate the tax on the sale of a material purchased for further processing into finished products and to place the tax on the ultimate consumer of the finished product processed from the raw material.” [12] This court’s findings regarding the purpose of the provision, together with this provision’s placement in the definition section, rather than in La. R.S. 47:305 with many cléar “exemptions,” indicate that the legislature meant this provision to be a limitation ab initio on the definition of 17“sale at retail.” Thus, it seems the “further processing provision” is an exclusion. Indeed, this conclusion follows logically from the underlying principle that “sales at retail” are subject to sales tax but sales “for resale” including, by extension, sales of materials for further processing before *281 resale, are categorically not' considered “sales at retail,” because the buyer is not the ultimate consumer.- Thus, we find the provision at issue is an exclusion and will be liberally construed in favor of the taxpayer, NISCO.
To further assist in our, understanding of this statute, we turn now to other interpretative tools at our disposal. The Louisiana Department of Revenue promulgated an administrative regulation to provide guidance on the exclusion’s meaning. La. Admin. Code, Title 61, Part I, § 4301, Re fail Sale or Sale at Retail (d) provides:
Sales of materials for further processing into articles of tangible personal property for subsequent sale at retail do not constitute retail sales. This exemption does not cover materials which are used in any process by which tangible personal property is produced, but only those materials which themselves are further processed into tangible personal property. Whether materials are further processed or simply used in the processing activity will depend entirely upon an analysis of the :end product. Although any particular materials may be fully used, consumed, absorbed, dissipated or otherwise completely disappear during processing, if it does, not become a recognizable and identifiable component which is of some benefit to the end product, it is not exempt under this provision. The fact that a material remained as a recognizable component of an end product by accident because the cost of removal from the end product was prohibitive or for any other reason, if it does not benefit the property by its presence, it was not material for further processing and the sale is not exempt under this provision. [Emphasis added].
Over the decades, this court has added a judicial gloss to aid in the understanding of what is contemplated by the statutory language of “materials further processed] into articles of tangible personal property.” La. R.S 47:301(l)(a)(i)(c)(i)(aa). In 1976, this: court in Traigle, 332 So.2d at 781, recognized a “purpose” requirement, distinguishing those materials which were purchased for “processing ‘into’ the finished article” from those materials |spurchased;“only to be used in the process of producing the manufactured product for sale.” A few years later, this court in Vulcan Foundry, Inc. v. McNamara, 414 So.2d 1193 (La.1981),- reiterated - the “purpose” factor in the test for determining the ultimate consumer of the raw material. Finally, this court in International Paper, Inc. v. Bridges, 07-1151, p. 19 (La.1/16/08), 972 So.2d 1121, 1134 succinctly captured the analysis for determining the “further processing exclusion’s” applicability to a raw material by framing it- in a three-part test:
From this 'rule, we recognize that raw materials “further processed” into end products are excluded from the sales and use tax provisions when: (1) the raw materials become recognizable and identifiable components of the end products; (2) the raw materials are beneficial to the end products; (3) the raw materials are materials for further processing, arid as ⅛ such, are purchased- with the purpose of inclusion in the end products.
- Armed with the proper test and the regulation’s guidance that the end product is the starting part of the analysis, the facts-of the -instant ■ case require us to determine which product, is the proper “end product” for purposes of applying the three-part test. The trial court’s reasons for ruling suggest that it viewed NISCO’s electricity and steam as the end product. (“It is also indisputable that limestone in any form, or its component-parts, are not *282 found in the steam and electricity produced.”) The court of appeal appears to have viewed the ash as the end product but was distracted by its characterization as a by-product. (“The true nature of the ash as an incidental by-product that-cannot be seen as [a] co-product is evidenced in the Partnership Agreement,”)[13] In any ■event, we must determine which product (electricity or ash) is the end product on which our entire analysis is centered and whether that product’s .status as a primary product or a by-product matters.
We find nothing in the law that requires the end product to be •the enterprise’s primary product. The' plain -language of the statute makes the ^exclusion applicable to “articles of tangible personal property.”[14] There simply is no distinction between primary products and secondary products-. Jurisprudentially, the Traigle court implicitly rejected a primary product test when it analyzed only the end product of chlorine, even though the taxpayer was in the business of making two additional saleable products (hydrogen and caustic soda). It only analyzed the chlorine because that was the only product that contained traceable amounts of the raw material at issue: carbon in the form of graphite anodes. It set out to consider the taxability of the graphite anodes ' without performing any primary product analysis, nor did it seek to ascertain which product generated the most profit for the taxpayer. Rather, the Tmi-gle court simply analyzed the one product with traces of the raw material for which the advantage of the “further processing exclusion” was sought. Thus, we find the lower courts committed legal error in not beginning,their-analysis-with the ash as the end product, regardless of its nature as a by-product or a secondary product. At the end of the day, the ash is produced and sold to LA Ash, making it an “article of tangible personal property for sale at l’etail.”
Having identified the ash as the end product to be analyzed, it is important to understand its chemical máke-up and the physical reactions at play in the manufacturing process. As noted earliér, the pet-coke used in the production of electricity releases sulfur when it is heated. Limestone, which is made up of calcium, carbon, and oxygen (collectively, calcium carbonate), chemically reacts with the sulfur' to make ash. Specifically, the calcium and oxygen from the limestone (calcium oxide) and the sulfur from the petcoke combine to make ash (calcium sulfaté). Essentially all of the calcium and oxygen from the limestone and the sulfur from the petcoke remain in the final ash product.
We move forward with the three-part test and its application to the purchase Itnof the limestone for further processing into ash.- The first two prongs of the test ask (1) whether the raw materials became recognizable and identifiable components of the end products and (2) whether the raw materials are beneficial to the end product. The Tax Collectors stipulated that these two 'élements were satisfied. However, out of an abundance of caution, we address the “benefit” factor insofar as we perceive the court of appeal’s analysis may have confused this prong of the test. Specifically, the court of appeal focused on the fact that “NISCO did nothing purposeful to affect the quality of the ash[,]” making its chemical makeup “accidental.”[15] It bases this conclusion on testimony and *283 documents from and between NISCO management that testing was done on the limestone to determine its effect on the electricity produced, but not with regard to “how a particular quality limestone would impact the ash product.”[16] Whether, or not testing is performed to determine a particular kind of limestone’s impact on the quality of the ash does not change the fact that the chemical make-up of the limestone is found in the ash and is an integral part thereof.[17] Indeed, as attested to by several NISCO managers and engineers and as undisputed by the Tax Collectors,without the calcium and oxygen from the limestone, the ash would not exist. Thus,' we find the limestone, as an integral, component part of the ash, clearly satisfies the “benefit” prong of the International Paper test.[18]
The crux of this matter lies in the third prong, which seeks to ascertain whether the raw materials are purchased for the purpose of inclusion in the end byproduct.The lower courts found NISCO did not purchase the limestone for the purpose of including it. in the ash. The Tax Collectors frame this as • a fact to be believed or rejected- However, we find the lower courts’ misunderstanding of the “purpose” test interdicted the fact-finding process, such that the finding regarding the purpose for the purchase of the limestone was the result of an improper legal analysis. This court in International Paper expressly rejected a “primary purpose” test. In that case, the taxpayer used three chemicals in its production of paper. Those chemicals .had a dual purpose of (1) removing/modifying lignin, which has a brown color, from the pulp (acting as a whitening agent) and (2) adding chemical components to .the final product.- The taxing authority sought to tax the chemicals because they were not purchased for the primary purpose, of being incorporated into the final paper product, while the taxpayer wanted to claim the “further processing exclusion” because the chemicals were additionally purchased to be included in the end product. The court, in rejecting the “primary purpose” test, -allowed a dual or multiple purpose test, so long as one of those purposes was “inclusion in thé end product.” International Paper, 972 So.2d at 1134.
• The lower courts in the instant case concentrated' on the following facts: ■
• NlSCO’s business manager testified that NISCO would not purchase limestone if NISCO was no longer producing electricity or if limestone was no longer needed in the production of electricity (ie., if‘sulfur emissions no longer were regulated or a new fuel was used).
• During the relevant tax periods, NIS-CO generated $739 million in electrici *284 ty sales, but only $6.8 million-in ash sales, making the ratio of electricity sales to ash sales- almost one hundred to one.
• The cost of limestone was $46 million, roughly $39 million more than the revenue produced by the ash.
• NISCO’s overall business purpose was ■ to make and sell electricity and steam,as evidenced by its Partnership Agreement.
We find that the lower courts’ emphasis on these - facts reveals that they | ^improperly considered irrelevant information-in determining whether the limestone was purchased for the-purpose-of inclusion in the final product of ash. These above-referenced factual considerations are relevant only to an inquiry regarding NISCO’s primary ■ purpose- for buying the raw materials, a test - that we have already jurisprudentially rejected. " (See International Paper, supra). Also, a focus on (or even a mere mention of) a comparative . profit analysis between the end products of electricity and ash and, additionally, a cost-versus-revenue analysis of the limestone and the ash, suggest that an “economic” component was added to the exclusive three-prong test. Such a test has no statutory, jurisprudential, or regulatory roots, nor does a “business purpose” test that seeks to establish the purpose of the taxpayer’s business.
The “further processing exclusion” simply seeks to ensure that double taxation is avoided by only taxing the ultimate consumer. To determine the rightful taxpayer of the raw material’s sales tax, only the manufacturing process (and the physical and chemical components of the materials involved therein) .is germane to the “purpose” test. -Thus, the only question to ask is whether the limestone was purchased with the purpose (although not necessarily the primary purpose) of inclusion in the final product of ash. We find the record undeniably supports an affirmative answer to this inquiry.
The purpose to produce and sell ash is evidenced in the “Partnership Agreement’s” language that NISCO would (1) conduct “any activities related” to - the manufacture of electricity and steam,[19] (2) construct substantial “New Facilities”, which contemplated the handling and sorting of the ash, and (3) receive income from the ash sales. Undisputed testimony established that NISCO actively | iapurchased equipment specifically designed for -the production of ash and sought a buyer for its ash. ■ For the- last twenty-two years, NISCO has sold one hundred percent of its ash product. NISCO’s current contract with its limestone supplier recognizes that the limestone will be used for the two-fold purpose of absorbing sulfur released by the petcoke and producing ash as a salea-ble product; As stated earlier, the ash brings in roughly $6.8 million in revenue. The Tax Collectors,' and the court of appeal, emphasize the ash’s comparatively small profit as it relates to the electricity sales and the cost of the limestone itself. However, nothing in the statute or case law leads’ us to conclude that those are relevant factors in the analysis. .The fact *285 that the ash profit contributes to NISCO’s bottom line and acts as a cost offset, rather than the company’s principal income, does not change the fact that the ash is still an article of tangible personal property that will be resold to another consumer, who will bear the ultimate tiurden of taxation. Accordingly, we find NISCO’s purposeful decisions related' to engineering, infrastructure, and marketing lead to the only possible conclusion that the lirhestone was purchased with the purpose — perhaps not the sole or primary purpose, but the purpose nonetheless — of making a saleable end product of ash. Since the limestone is a recognizable, identifiable, beneficial material bought for the purpose of inclusion in the ash' product, we find it qualifies for the “further processing exclusion.” ■
In finding NISCO’s purchase of limestone is excluded from sales tax, we dé-cline to adopt a compromise approach espoused by the Tax Collectors and addressed during oral' argument. Such an approach to the taxation of raw materials for further processing contemplates apportioning the tax exclusion based upon the percentage of the material that ends up in the final product. ■ Justice Marcus, in the Traigle opinion, concurred > in part and dissented in part, stating that in his view, the tax collector should ■ be able to assess taxes on the portion of the raw material that “is not processed into the product but rather is discarded by the manufacturer as |¶.[industrial waste.”[20] No majority opinion has ever adopted this approach, nor is there any statutory authority to ¡support this divisible taxing theory. Additionally, from a practical standpoint, there lacks clear guidelines on how to divide the tax. For instance, one could argue, like Justice Marcus, that, the tax could be based on the percentage of the materials used up in the process. The unique 'manufacturing process :of each product, though, prevents the articulation of a precise test by which to measure the exclusion’s applicability. In Traigle, a percentage of,the graphite anodes was discarded as waste.,. In Vulcan] a portion of the ;coke was used to heat and melt scrap-iron and also to add carbon to the end product. In International Paper, only partial elements (portions .of the oxygen atoms) from the three chemicals ended up in the paper. Here, the calcium and oxygen from the limestone are component parts of the ash, while the carbon is not. How would a court quantify an ’element’s ■ importance in a chemical reaction that ultimately produces an overall saleable product?
To this point, in International Paper, we made it clear that the end product does not have to be made up of the exact chemical and physical composition of the raw materials. ' Specifically; we stated:
However, our review of the applicable' law and jurisprudence does "not suggest that the raw materials themselves \ie., the exact chemical/physical compositions of the raw materials) must appear in the end products ....
⅜ ⅝ *
It would be illogical to assume that raw materials would be excluded from sales and use tax, if those raw materials themselves were not used for incorporation into the final products; however, as we have already determined, nothing in the legislation, administrative , rule, -and/or jurisprudence mandates that the chemb cal/physical composition(s) ,of raw materials incorporated into end products remain the same after-their incorporation into the final products. We acknowledged this notion in Vulcan [supra], as *286 in that case, we were dealing with the incorporation of carbon into the final products (ie., the iron castings), yet the carbon was derived from the raw material, ie., coke.
|1B[Emphasis in original].[21]
Thus, this court has already considered the scope of the exclusion as it relates to an apportionment theory. Indeed, if the raw material were to appear in the exact same form both in its original state and in the end product, it could hardly be said that any “further processing” actually occurred. Because there is' no requirement that the identical composition exist in the end product, there is no basis to put a value on certain elements that remain in the end product versus other elements that are used up in the process.
In the instant case, the Tax Collectors argue the valuable element in the raw material of limestone is the carbon, and that the carbon is used up in the process of absorbing the sulfur emissions. Thus, they contend, a value should be placed on the carbon and taxed. They suggest using an economic value, whereby the cost of the limestone ($46 million) less the profit of the ash ($6.8 million) should be taxed. However, this approach would result in a battle of the experts, wherein economists, with the help of chemists, would be called upon to put price tags on individual elements that make up a compound, when we have already acknowledged in International Paper that the incorporation of derivatives in an end product is sufficient for the exclusion’s potential applicability.- Moreover, a review of the record does not lead us to believe that the limestone’s carbon is not used to produce the ash. While it is certainly used to inhibit the release of sulfur, testimony reveals that the moment - the limestone is introduced into the process, ash is immediately created. Thus, from a factual standpoint, we cannot put a value on the carbon’s role in the creation of the ash. Accordingly, for reasons rooted both in principle and in practicality, we decline to fashion a test that makes sales tax on the purchase of a single raw material divisible.
Last, we observe that both the court of. appeal and the Tax Collectors | ^appeared to have viewed the taxability of the limestone from a policy-based viewpoint of common sense dictating against inequity. In other words, the exclusion should only apply to the manufacturing ingredients that lead to the enhanced value of the end product, and because NISCO spends $39 million more in its limestone purchase than it makes in its ash sales, there is an injustice that results from excluding that purchase from the payment of sales tax. However, we see no requirement that the end product must boast an increased value or generate a certain profit. At this point, we feel compelled to note that if the legislature chooses to narrow the “further processing exclusion” by way . of requiring a profit, or writing into law a new test that embodies a “primary product” or “primary purpose” factor, or otherwise adding an economy-based consideration, we will adhere to our constitutionally delineated role of applying that new law. Until then, we note the existing expression of legislative intent in SCR 136 (2007 Reg. Sess.), which encourages courts and the Louisiana Department of Revenue to adhere to the exclusive three-prong test set forth by the courts. Particularly, the legislature recognized that many other states do not tax any raw materials used in the manufacturing of products for resale. Deviation from this three-prong test, as warned by the legislature, could “undermine the efforts of Louisiana to attract additional investment *287 dollars in the state.”[22] Accordingly, we find the conclusion reached herein best comports with ■ the legislative intent regarding taxation of materials further processed into articles of tangible personal property.
CONCLUSION
We find NISCO’s by-product of ash is the appropriate end product to analyze for purposes of determining the “further processing exclusion’s” applicability to the purchase of limestone.'' Moreover, ünder a proper “purpose” test, the third prong of the three-part inquiry enunciated in International Paper is 117satisfied, as"'evideficed by NISCO’s choice of manufacturing process and technology, its contractual language utilized in its purchasing of the limestone, and its Subsequent marketing and sale of the ash. For the reasons expressed herein and consistent with the liberal statutory construction that is , afforded to a taxpayer claiming an exclusion, we reverse and rule in favor .of NISCO. We remand the matter to the trial court to fix the amount of the judgment in a manner consistent with this opinion.
REVERSED AND REMANDED.
HUGHES, J., concurs in part and dissents in part for the reasons assigned by Weimer, J.
KNOLL, J., dissents and assigns reasons.
WEIMER, J., concurs in part and dissents in part and assigns reasons.
HUGHES, J., concurs in part and dissents in part for the reasons assigned by WEIMER, J.

. La. R.S. 47:301(10)(c)(i)(aa) provides: "The term ‘sale at retail' does not include sale of materials for further processing into articles of tangible personal property for sale at retail.”

. The overlap of the tax periods is a result of different state and local tax periods; additionally, the Louisiana Department of Revenue is attempting to collect taxes in two of the suits, while NISCO is seeking a refund of local taxes it paid under protest in the other two suits.

. Bridges v. Nelson Industrial Steam Co., 12-477 (La.App. 3 Cir. 11/7/12), 106 So.3d 147.

. Bridges v. Nelson Industrial Steam Co., 13-171 (La.3/8/13), 108 So.3d 1168.

. Bridges v. Nelson Industrial Steam Co., 14-1250 (La.App. 3 Cir. 6/24/15), 169 So.3d 711.

. Bridges v. Nelson Industrial Steam Co., 15-1439 (La.10/30/15), 179 So.3d 610.

. Rosell v. ESCO, 549 So.2d 840 (La.1989).

.' Id.

. La. Civ.Code art. 9 and La. R.S. 1:4.

. See LAC 61:1:4301, discussed infra.

. id.

. BP Oil Co. v. Plaquemines Par. Gov’t, 93-1109, p. 12 (La.9/6/94), 651 So.2d 1322, 1330, on reh’g (Oct. 13, 1994).

. Bridges v. Nelson Industrial Steam Co., 169 So.3d at 722.

. La. R.S. 47:30.1(10)(c)(i)(aa).

. Bridges v, Nelson Industrial Steam Co,, 169 So.3d at 720.

. Id,

. While we find quality testing is irrelevant to the “benefit” factor, we nevertheless note the record testimony that establishes that there was no impact on the quality of the ash from the change in the limestone source or quality of the limestone. Thus, testing for quality control, though not required to satisfy the "benefit” prong, would -have been unnecessary anyway.

. We note, and reject, the ;Tax Collectors’ position that the ash was a residue or waste product left over from the production of steam'and electricity. In attempting to characterize the ash as an impurity, the Tax Collectors rely on language in the Vulcan decision that raw materials that only incidentally benefit the end product, do not meet the purpose requirement and are, thus, taxable. Because the limestone is crucial to, and an elemental part of, the end product of ash, we distinguish the instant case from the holding of Vulcan in this respect, Moreover, to the extent the Tax Collectors contend the raw material must be beneficial to the taxpayer's business, we herein reject that for the same reasons we reject a primary product test.

. The "Purpose” of NISCÍO’s business ventured, as stated in the "Partnership' Agreement” is:
The venture is created, and shall be conducted, for the purpose of designing, constructing, ’ owning, operating, and controlling electric' power generating facilities" in the Lake Charles, Louisiana area, and producing electricity for sale to [Gulf States Energy] and steam' to supply all or a portion of the steam needs of the industrial facilities of the Industrial Participants in the Lake Charles area, and "conducting any activities 'related thereto 'or contemplated by this Agreement.” [Emphasis added.]'

. Traigle, 332 So.2d at 783.

. International Paper, 972 So.2d at 1133— 1134.

. SCR 136 (2007 Reg. Sess.).