WEIMER, J., dissenting.
 

 With all due respect, I find the majority opinion unfortunately eviscerates the long, significant history the citizens of Louisiana have embodied within La. Const. art. I, § 4 (B)(6) to protect private business from takeover by the government. The majority opinion thereby subjects business interests across Louisiana to increased risk of government takeovers, which has the effect of thwarting private business from initiating economic development that competes with governmental enterprises. While agreeing that the determination of whether the St. Bernard Port, Harbor & Terminal District ("the Port") expropriated the property and port facilities owned by Violet Dock Port, Inc., LLC ("Violet") for the purpose of operating that port facility or halting competition with the Port is, to an extent, fact-based, I find that legal errors committed by the district court interdicted the fact-finding process, necessitating
 
 de novo
 
 review. I additionally find that the perfunctory and, in the end, erroneous, manifest error review compounds the legal error of the district court, exposing to serious erosion the conscious, concerted efforts to protect private business enshrined in our constitution. Therefore, I respectfully dissent from the majority opinion.
 

 Historical Background
 

 While the resolution of this case centers around the meaning and application of a singular provision in the constitution, the historical context should be considered in evaluating this
 
 res nova
 
 issue.
 

 The citizens of Louisiana have long maintained, through the constitutional provisions they ratified, that the situations in which the government can expropriate private property are greatly limited. Providing
 a guarantee prominently positioned in the second section of the Bill of Rights, the 1921 Constitution indicates: "Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid." La. Const. 1921 art. I, § 2.
 

 With the enactment of the most recent constitution, this protection was enhanced. Under the 1974 Constitution, expropriation requires not merely a "public purpose," but a "public and necessary purpose." La. Const. 1974 art. I, § 4 (B). In addition, the amount of compensation owed is not limited to "just and adequate compensation," as in the 1921 Constitution, but expanded to encompass compensation to "the full extent of [the owner's] loss."
 

 Id.
 

 Furthermore, in a provision specifically directed to the issue at hand, a third protection was added.
 
 See
 

 id.
 

 While prohibitions against government engaging in commercial enterprise had been enshrined in constitutions dating back over one-and-a-quarter centuries (
 
 see
 
 the 1879 Constitution),
 
 [1]
 
 the 1974 Constitution, consistent with its intent to provide increased protection to private interests from governmental takings, added a new prohibition, currently found in La. Const. art. I, § 4 (B)(6). This prohibition, which I refer to as the "private business enterprise protection clause," provides in relevant part:
 

 No business enterprise or any of its assets shall be taken for the purpose of operating that enterprise or halting competition with a government enterprise.
 

 The clause represents "the first provision in any state constitution to prohibit the government from seizing the means of production," Louis Woody Jenkins,
 
 The Declaration of Rights
 
 ,
 
 21 Loy. L. Rev. 9
 
 , 24 (1975), and evidences a clear and unambiguous choice by the electorate to curtail government efforts to take business property or the business itself.
 

 With the above-detailed protections added to and enshrined in Article I, § 4, the 1974 Constitution"goes beyond other state constitutions, including our 1921 Constitution, and the federal constitution in limiting the power of government to regulate private property."
 
 State v. 1971 Green GMC Van
 
 ,
 
 354 So.2d 479
 
 , 486 (La. 1977).
 

 However, the citizens of Louisiana did not stop there, demonstrating an adamant and emphatic determination to protect private business from government takeover. When property rights protected by the federal constitution were seemingly eroded by the United State Supreme Court's ruling in
 
 Kelo v. City of New London, Connecticut
 
 ,
 
 545 U.S. 469
 
 ,
 
 125 S.Ct. 2655
 
 ,
 
 162 L.Ed.2d 439
 
 (2005), the Louisiana electorate responded by enshrining additional protections in our state constitution.
 
 See
 

 2006 La. Acts 851
 
 , § 1 (approved September 30, 2006). These protections include a prohibition from taking property "for predominant use by" or "transfer of ownership to any private person," and the inclusion of a more "limited" definition of "public purpose."
 
 See
 
 La. Const. art. I, § 4 (B)(1)(a) and (b);
 

 Id.
 

 , § 4 (B)(2). Furthermore, in a rejection of the core holding of
 
 Kelo
 
 , the Louisiana electorate added the following prohibition: "Neither economic development, enhancement of tax revenue, or any incidental benefit to the public shall be considered in determining whether the taking or damaging
 of property is for a public purpose ...." La. Const. art. I, § 4 (B)(3).
 

 As evidenced by the above, Louisiana has a long and storied history of protecting private property interests from undue governmental interference. Nowhere is that strong interest more evident than in the protections extended under La. Const. art. I, § 4 (B)(6), protections unique to Louisiana, but entirely consistent with the core principles underlying Louisiana's interest in protecting private property rights.
 

 It is the meaning and application of La. Const. art. I, § 4 (B)(6) that is ultimately at issue in this case, an issue which is
 
 res nova
 
 in this court, but not without guidance for its resolution. Foremost among the guiding principles is the dictate that the starting point in interpreting constitutional provisions is the language of the provision itself and that, when the language of a constitutional provision is clear and unambiguous, that language must be given effect.
 
 Louisiana Department of Agriculture and Forestry v. Sumrall
 
 , 98-1587, pp. 4-5 (La. 3/2/99),
 
 728 So.2d 1254
 
 , 1258. In this case, no party contends that the language of Article I, § 4(B)(6) is ambiguous or susceptible to multiple interpretations. Therefore, to evaluate the provision, it is not necessary to look behind its clear language. However, for the purpose of placing the constitutional provision in its historical context, it is relevant to note that secondary sources confirm the clear intent behind the words of the enactment.
 

 As explained by Delegate Jenkins, the co-author and floor sponsor of Section 4(B)(6), the provision "was clearly intended to counter what delegates perceived as excessive interference by government in the economy and the growing possibility that government would attempt to take over certain business enterprises." Jenkins,
 
 The Declaration of Rights
 
 , 21 Loy. L. Rev. at 24.
 
 [2]
 
 Given this purpose, "the provision should be broadly interpreted to prevent both direct and indirect efforts to seize any private industry."
 

 Id.
 

 Of course, as acknowledged by Delegate Jenkins and as evidenced in its language, the prohibition contained in Section 4 (B)(6) is not absolute, and certain expropriations may have the effect of terminating a business enterprise, as, for example, when a highway right-of-way results in the taking of property belonging to a grocery store, causing it to go out of business.
 

 Id.
 

 , 21 Loy. L. Rev. at 25. In such cases,
 
 the purpose of the expropriation is crucial.
 

 Id.
 

 Pursuant to Section 4 (B)(6), "[a]ny effort to use the power of eminent domain to take over an existing business or seize its assets in order to create a similar government enterprise or to put an enterprise out of business in order to improve the competitive advantage of a government enterprise is unconstitutional."
 

 Id.
 

 The Litigation
 

 With this historical context in mind, it is appropriate to turn to the instant case in which, using the "quick-take" provisions of La. R.S. 19:141,
 
 et seq.
 
 , the Port expropriated Violet's privately owned port facility. Violet filed a motion to dismiss the petition for expropriation, arguing, among other things, that the taking violated La. Const. art. I, § 4 (B)(6). Following an evidentiary hearing, the district court denied the motion to dismiss based on a finding that the taking served a public purpose. In a per curiam issued in connection
 with that ruling, the district court reasoned:
 

 Export of goods and commodities through the port is one of the basic industries of St. Bernard Parish. The acquisition of the Violet terminal would be a logical extension of port services in St. Bernard. The port would acquire heavy duty docks and forty two hundred (4200 LF) linear feet of Mississippi River frontage available for immediate use. Thirty eight (38) acres of presently undeveloped uplands would be available for cargo storage. The contemplated construction and use of the property would bring needed revenues into the community which is still recovering from the effects of the 2005 hurricanes and provide needed employment to its citizens. The predominant use for the property would be by the public, not for use by, or for transfer of ownership to any private person or entity. The Court is apprised that the expropriation will not affect the use by MSC ["Military Sealift Command"] for its vessels should MSC elect to continue that use.
 

 Standard of Review
 

 The majority opinion maintains that the district court's per curiam represents a determination "that the business-enterprise clause does not apply here from a
 

 factual
 

 standpoint" and, thus, the district court's ruling is subject to manifest error review.
 
 St. Bernard Port, Harbor & Terminal District v. Violet Dock Port, Inc., L.L.C.,
 
 17-0434, op. at 251, 252 (La. 1/30/18) (emphasis in original). I respectfully disagree, believing that a more careful analysis in light of the historical context or "a deeper look at the [district] court's reasons for ruling ... reveals an error in [the] legal analysis, requiring this court to conduct a
 
 de novo
 
 review of the record."
 
 See
 

 Bridges v. Nelson Indus. Steam Co.
 
 , 15-1439, p. 4 (La. 5/3/16),
 
 190 So.3d 276
 
 , 279.
 

 Even a cursory review of the district court's per curiam reveals that it contains no factual findings or legal determination regarding the primary reason cited by Violet for its contention that the taking is unconstitutional-that it violates La. Const. art. I, § 4 (B)(6)'s prohibition against the taking of a business enterprise or any of its assets for the purpose of operating that enterprise or halting competition. Indeed the per curiam makes no mention of the private business enterprise protection clause or any factual findings relating thereto. Instead, the per curiam focuses solely on considerations prompted by Section 4 (B)(1);
 
 i.e.
 
 , whether the taking is for the predominant use or transfer of ownership to any private entity.
 
 [3]
 
 Furthermore, it focuses on economic factors-needed revenues and employment-that are
 
 expressly prohibited
 
 from consideration in determining public purpose by Section 4 (B)(3).
 
 [4]
 

 "The manifest error standard of review assumes that the trier of fact applied the
 correct law in arriving at its conclusion."
 
 Winfield v. Dih
 
 , 01-1357, p. 8 (La.App. 4 Cir. 4/24/02),
 
 816 So.2d 942
 
 , 948. That assumption is not warranted in this case where the district court's reasons reflect that the court's decision was guided by principles that are either irrelevant to the question of whether the taking violated the private business enterprise protection clause,
 
 i.e.
 
 , whether the taking is for the predominant use or transfer of ownership to a private entity;
 
 [5]
 
 or expressly prohibited from consideration in connection therewith;
 
 i.e.
 
 , whether port expansion will add revenues and jobs to the local community. Because, as was the case in
 
 Bridges
 
 , the district court's reasons focus on factors which are irrelevant to the question presented and (in the instance of economic benefits) prohibited from consideration by the constitution itself, an error in the court's legal analysis is exposed, requiring
 
 de novo
 
 review.
 
 See
 

 Bridges
 
 , 15-1439 at 4,
 
 190 So.3d at 279
 
 .
 
 [6]
 

 By focusing on La. Const. art. I, § 4 (B)(1), and its admonition that, except as specifically authorized by La. Const. art. VI, § 21, no property shall be taken for predominant use or transfer of ownership to any private entity, the district court elevated the general language of that provision over the specific language of Article I, § 4(B)(6), making
 
 no
 
 findings with respect to the central issue presented here-whether the taking violates the private business enterprise protection clause. The majority opinion, I believe, falls into similar error. In focusing on the provisions of Article I, § 4(B)(2)(vi), which define a "public purpose" to include expropriation by public ports to facilitate the transport of goods in commerce, the majority opinion elevates this broad general expropriatory authority over the specific qualifying limitation embodied in Section 4(B)(6), in effect untethering the Port's taking authority from the limitation of the private business enterprise protection clause. However, Section 4 (B)(6) is a limitation on the "public purpose" definition of Section 4 (B)(2)(vi), and it specifically counsels that the taking of a business enterprise for the purpose of operating or halting competition with that enterprise is not a legitimate "public purpose."
 

 As Delegate Jenkins' comments indicate, the purpose of the expropriation is crucial to the determination of whether there is an unconstitutional taking within the meaning of Section 4 (B)(6). In assessing whether the taking is for a purpose consistent with the constitutional strictures of this provision, certain principles of interpretation apply. Because "expropriation proceedings are in derogation of the right of individuals to own property, the law governing these proceedings must be strictly construed against the expropriating authority."
 
 State v. Estate of Davis
 
 ,
 
 572 So.2d 39
 
 , 42 (La. 1990). This strict construction against the expropriating authority is consonant with the broad interpretation of Section 4 (B)(6) urged by Delegate Jenkins, given that
 Section 4 (B)(6) has as its similar aim the protection of private business enterprise against excessive government interference. In addition, "every clause in a written constitution is presumed to have been inserted for some useful purpose, and courts should avoid a construction which would render any portion of the constitution meaningless."
 
 Succession of Lauga
 
 ,
 
 624 So.2d 1156
 
 , 1166 (La. 1993).
 

 In this case, to the extent it can be argued that the district court made a factual finding with respect to the "purpose" for the expropriation, it appears the court simply accepted at face value the Port's stated reason for expropriating Violet's property without considering the effect of that taking.
 
 [7]
 
 Such an analysis is constitutionally deficient, as the myopic focus on the Port's stated reason for the expropriation without any examination of the effect of the taking would allow the Port, or any expropriating authority, virtually unfettered authority to expropriate property as long as it professed an ostensible proper motive for the taking. This would be true even if the stated purpose also had the effect of enabling the expropriating authority to take over and operate a private enterprise, or halt private competition, rendering Section 4(B)(6) meaningless.
 

 It is precisely this type of analysis of Section 4 (B)(6) that Delegate Jenkins cautioned against when he offered as an example of a taking prohibited by Section 4(B)(6), the expropriation of apartments or rental homes for the purpose of constructing public housing.
 
 See
 
 Jenkins,
 
 The Declaration of Rights
 
 , 21 Loy. L. Rev. at 25. The parallels to that example are evident in this case. Here, pointing to La. Const. art. I, § 4 (B)(2)(b)(vi), which defines "public purpose" to include continuous public ownership of property by public ports "to facilitate the transport of goods ... in domestic or international commerce," the Port seeks to expropriate for the stated purpose of enhancing and expanding its role as a market participant in the port service industry, property belonging to a private participant (Violet) in the same industry. However, this type of taking runs squarely afoul of Section 4 (B)(6) and the protection of private enterprise from fear of governmental takeover that this constitutional provision was intended to promote.
 

 Undeniably, public ports have been granted expropriation powers under the constitution to facilitate the transport of goods in commerce. Unquestionably, public ports are significant economic engines, that work to support trade, enable Louisiana's energy and agricultural industries to further enhance the economy, and provide employment and business opportunities to local, regional, and the state's economies. However, private enterprise does likewise. Ports are granted substantial authority to operate, but ports cannot take over an on-going private business to operate that business or to end competition. In Section 4(B)(6), the people of this state have made a conscious decision to limit governmental interference with private enterprise, and that limitation must be respected. Moreover, it can only be respected (and effectuated) by an examination not only of the stated reasons for expropriation, but of the effect of that taking as well.
 

 De novo review
 

 The ultimate question presented in this case is one that is directed by the language of Section 4 (B)(6): whether Violet's
 business enterprise or any of its assets was taken by the Port for the purpose of operating that enterprise or halting competition with the Port enterprises. At the hearing on the motion to dismiss, Violet contended that the Port's taking runs afoul of both prongs of Section 4 (B)(6). According to Violet, the Port took its property for the purpose of operating its layberthing enterprise and also for the purpose of operating its docks for bulk cargo in the future (a venture in which Violet had engaged and into which it was expanding), thereby halting competition from Violet. The testimony and evidence on this point was extensive, with both sides presenting opposing views and conflicting testimony. Nevertheless, at the conclusion of the process, certain facts were undisputed.
 

 Violet owned one mile of the ten miles of river-front property within the Port's jurisdiction on which it had constructed a facility consisting of five docks and related infrastructure. For decades, Violet had contracted with the United States Military Sealift Command ("the Navy") to layberth and service ocean-going Navy ships. While layberthing for Navy (and some commercial) vessels was Violet's primary operation, it did perform some repair and cargo operations at its docks.
 

 In 2006, due to a growing demand for cargo services, the Port found itself operating at capacity and in need of expansion. The Port identified Violet's property as being best suited for its expansion needs and contacted Violet to discuss purchasing its property. In 2007, the parties tentatively agreed on a purchase price. To facilitate the purchase, the Port applied for funding through the Louisiana Department of Transportation and Development's Port Priority Program. A Port Priority Application ("PPA") was submitted in 2008 seeking the maximum grant of $15 million to purchase the property. In its application, the Port represented that the Violet property was best and ideally suited for the transfer and storage of dry and liquid bulk commodities, and that development of the property for this purpose would take place in three phases. In a letter submitted in connection with the application, the Port identified the Navy contract and represented to DOTD that "the [P]ort will derive from this proposed project a lease with the Navy/MARAD in the approximate amount of $550,000 per year for Navy/MARAD ships occupying the berths," that it will "continue to compete for these MARAD/Navy contracts," and that "the annual net revenue from the Navy contracts at the Violet site has averaged $550,000 [and] [f]uture contracts are expected to be in that same ... range." In essence, the Port represented that the Navy contract could be figured in to DOTD's required rate of return for funding the project. Based on the Port's representations, DOTD awarded it the requested funding.
 

 Ultimately, the negotiations for the sale of the property were unsuccessful. In the interim, however, Violet continued to operate and commenced efforts to expand its own cargo operations at its facility, obtaining permits to allow more cargo operations and constructing a new berth for cargo use. Violet also entered into an option agreement with Vulcan Materials for lease of the new berth and ten adjoining acres to transload and store aggregate bulk cargo.
 
 [8]
 

 In December 2010, the Port filed its petition for expropriation. In that petition, the Port averred that the property was necessary and suitable for bulk cargo operations. It described the plans for the Violet facility as taking place in three phases.
 

 The petition identifies the Navy contract and avers that during Phase I of the development, "[t]he St. Bernard Port intends to enter into a new contract with the Military Sealift Command for its continued use of the Violet Port."
 

 Violet filed a motion to dismiss the expropriation proceeding, challenging its public purpose. At the hearing on the motion, the Port offered testimony that Violet's property was the only property in the area suitable for handling large-scale bulk cargo operations. It offered its Port Priority submissions and testimony related thereto. The Port acknowledged that it intended to take over the Navy contract and continue to service the Navy ships on the property for at least 8 to10 years, although it contended that the contract was an "afterthought" and "not one of our goals." The Port reiterated its three-phase plan for development of the Violet facility, but acknowledged that Phase I, the only phase that was actually funded, was simply to acquire the property and enable Associated Terminals, its Marine Terminal Operator, to occupy and use the site for stevedoring operations.
 

 The district court denied Violet's motion to dismiss the expropriation proceeding, and the case moved to the just compensation trial. By the time of this trial, the Port had contracted with the Navy for continued layberthing at the former Violet site. Ironically, it contended, and the district court found, that the highest and best use of the property was not for large-scale cargo operations, as the Port had previously contended when taking the property, but that the highest and best use of the property was layberthing coupled with a limited intermodal container terminal-essentially, a continued use of the property as it was being used by Violet.
 

 Whether viewed at the granular level (focusing on the scope of Violet's layberthing and cargo operations) or at a broader level (focusing on the role of both the Port and Violet as operators of riverfront port facilities), it appears from the foregoing undisputed facts that the Port's taking in this case is unconstitutional within the meaning of La. Const. art. I, § 4 (B)(6). The facts establish that the Port obtained $15 million from the state to facilitate the purchase of Violet's property and that it planned to take and use Violet's assets and existing customer revenue (the Navy contract) as interim financing to fund the expansion of cargo operations. The facts likewise establish that while Violet's cargo operations were "negligible," they were not non-existent, and Violet was making its own efforts to expand into the cargo handling arena, in competition with the Port. The PPA, the petition for expropriation, and the testimony at trial all establish that the Port intended to enter into a contract with the Navy for its continued use of the Violet port during Phase I of its port development plan. Thus, while the Port maintains that it was and is not in the layberthing business, the facts disclose that layberthing the Navy ships was an integral part of its plan, it effectuated that plan, and it is still performing layberthing services today, which include the Navy contract.
 

 When a governmental entity takes and uses private business property or assets to generate revenue in ways similar to a private enterprises's prior operations, or when a governmental entity necessarily will use the property or assets as part of its own business plans, that taking is one "for the purpose of operating that enterprise" within the meaning of Section 4(B)(6). Furthermore, when the taking will necessarily allow a governmental entity to increase its market share and prevent a growing or potential competitor from entering into the market or expanding its
 business, the taking is for the purpose of "halting competition with a government enterprise."
 

 Under the facts in this case, reviewed
 
 de novo
 
 , the district court erred in denying Violet's motion to dismiss the petition for expropriation, as that taking is unconstitutional under Section 4(B)(6).
 

 Manifest Error Review
 

 As indicated, ports are extremely important economic engines for the state; this fact is undeniable. However, the people of this State have made a conscious, concerted commitment, at every opportunity (particularly when Section 4(B)(6) was adopted in 1974 and again in 2006 when further restrictions were imposed post-
 
 Kelo
 
 ), to protect private ownership against government takeover of the means of private production. It is this longstanding, fundamental constitutional principle that is at stake in this case. Furthermore, while I remain convinced that
 
 de novo
 
 review is warranted due to the errors in the district court's legal analysis, even should the manifest error rule be applied to the factual findings (that the district court clearly did not make), I would find any "factual" determination that the taking in this case was not for the purpose of operating Violet's port facility or eliminating competition from Violet is manifestly erroneous.
 

 Certainly, under the manifest error rule, where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous.
 
 Rosell v. ESCO
 
 ,
 
 549 So.2d 840
 
 , 844 (La. 1989). However, where documents or objective evidence so contradict a witness's story, or the story itself if so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, a reviewing court may well find manifest error.
 

 Id.
 

 at 844-45
 
 . Indeed, while deference should be accorded to the factfinder, because appellate courts have a constitutional duty to review both law and facts, they have the right and obligation to determine whether a district court judgment is clearly wrong based on the evidence.
 
 See
 

 Ambrose v. New Orleans Police Dept. Ambulance Service
 
 , 93-3099, p. 8 (La. 7/5/94),
 
 639 So.2d 216
 
 , 221. This concept is particularly applicable when this court evaluates a
 
 res nova
 
 constitutional issue.
 

 In this case, the uncontradicted
 
 objective
 
 evidence demonstrates the pretextual nature of the Port's
 
 subjective
 
 contention that the taking was not for the purpose of assuming Violet's layberthing operations with the Navy, and that layberthing operations were an "afterthought." This objective evidence-in a nutshell-is found in the Port's PPA submitted to DOTD (in which it represented that the Navy contract could be figured into DOTD's required rate of return for extending funding to the Port), in the petition for expropriation (in which the Port avers that it "intends to enter into a new contract with the Military Sealift Command for its continued use of the Violet Port"), and in the fact that the Port, after the quick-taking, entered into a contract with the Navy and continues to this date to perform the same layberthing operations once conducted by Violet.
 
 [9]
 

 The same analysis holds true for the Port's contention that the taking was not for the purpose of eliminating competition from Violet because Violet's cargo operations were "negligible" and the Port was not in the "layberthing" business and thus did not compete with Violet. The objective
 facts demonstrate that while the Port contends the expropriation was motivated solely by its need to expand its cargo operations, and that the Violet property was the only property suitable for expansion and creation of a liquid cargo facility, once the taking was effected and valuation was at issue, the Port "flipped the script" and argued that the highest and best use of the property was not for large-scale cargo operations, as it had previously contended, but for layberthing coupled with a limited intermodal container terminal-essentially, a continued use of the property exactly as it was being used by Violet. The
 
 subjective
 
 contention that the taking was not for the purpose of taking over Violet's business enterprise is belied by the
 
 objective
 
 reality of what has occurred.
 

 The facts, as acknowledged in the majority opinion,
 
 [10]
 
 establish that while Violet had historically not been engaged in large-scale cargo operations, Violet was actively expanding into that area, having constructed a new berth that would handle cargo and having entered into an option contract with Vulcan Materials for lease of the new berth and ten adjoining acres to transload and store bulk cargo. In other words, the facts establish that while Violet had not been an active competitor for bulk cargo in the past, it had-like the Port-recognized and acted on the expanding market need for bulk cargo operations, bringing it into competition with the Port, a competition which was effectively "nipped in the bud" and eliminated through the taking.
 
 [11]
 
 Again, the
 
 subjective
 
 contentions of the Port are contradicted by the
 
 objective
 
 reality of what has occurred.
 

 The majority opinion, in finding no manifest error in the district court judgment denying the motion to dismiss the expropriation, relies heavily on the federal district court judgment remanding this case to state court following its removal to federal court.
 
 St. Bernard Port, Harbor, & Terminal Dist. v. Violet Dock Port Inc., LLC
 
 ,
 
 809 F.Supp.2d 524
 
 (E.D. La. 2011). It quotes from the federal ruling, which found that Violet submitted nothing, "other than its own characterization, to suggest that acquisition of the [Navy] property was the
 
 primary motivating cause
 
 of this 70 acre expropriation."
 
 See
 

 St. Bernard Port
 
 , op. at 248 (emphasis supplied) (quoting
 
 St. Bernar
 

 d
 

 Port
 
 ,
 
 809 F.Supp.2d at
 
 531 ). This quote suggests-apart from factual disputes-a legal interpretation of Section 4 (B)(6) that is at odds with its plain language. In other words, the federal district court seems to advocate for a "substantial factor" or "primary purpose" test for interpreting the mandate of Section 4 (B)(6). Such an approach is fraught with danger, as a port would always have the option to take over private property as long as it professed a "primary" purpose of expanding commerce, even if its purpose also had the effect of eliminating private competition. Such an interpretation would render La. Const. art. I, § 4 (B)(6) largely meaningless. Regardless, ultimately, this court is the final arbiter of the meaning of this state's constitution, an obligation which we should not yield on a
 
 res nova
 
 issue.
 

 At issue in this case is the decision of the people, as evidenced through the constitution, to protect private enterprise from governmental overreach. I would caution, therefore, against an approach that focuses myopically on the details of the respective "operations" of what are, at their core, both commercial ports in determining whether there is a violation of Section 4 (B)(6). Such an approach runs the proverbial risk that one will lose sight of
 the forest for the trees and, in the process, render the protections of Section 4 (B)(6) meaningless.
 

 While I sympathize with sentiments that this case should be limited to its facts, one cannot ignore the legal ramifications that arise from application of those facts. Will the Port (or another public port) next argue that it can expropriate a private port engaged in liquid cargo storage operations because the Port does not currently engage in liquid cargo storage operations and, thus, does not "compete" with a port engaged in such? Will it be able to argue that its "primary" purpose is not to assume the liquid cargo operations, but to expand its bulk cargo operations at that location? Any parsing here ignores what actually, objectively occurred. The Port took the Violet property and assumed its operations while ending competition, violating both the letter and spirit of Section 4(B)(6).
 

 Ultimately, on the facts of this case, the result of the majority opinion is not what was contemplated by the citizens of Louisiana when they demonstrated in the constitution a consistent and concerted effort to safeguard private entities from takeover by the government.
 

 The people of Louisiana repeatedly made judgments that shield private business from the government's entry into the marketplace by taking over an ongoing business or ending competition. The people of Louisiana effectively provided a safeguard for private ownership and for the means of production in the fundamental law of this state. The Port is not without a remedy. If the government wants to enter the marketplace and take over an ongoing business, it must act like any other business; it must purchase the ongoing business at a mutually agreeable price. The constitution is clear-the government cannot simply take a private business to operate the business or to end competition.
 

 For these reasons, I respectfully dissent.
 

 GUIDRY, J., dissents and assigns reasons.
 

 I respectfully dissent from the majority holding today that the St. Bernard Port's taking of Violet Dock Port's private property was a constitutionally authorized expropriation under the facts in the record before us. Although the St. Bernard Port is granted broad powers under La. Const. art. VI, § 21, an important limitation on those powers is set forth in La. Const. art. I, § 4, specifically La. Const. art. 4(B)(6). That article provides as follows: "No business enterprise or any of its assets shall be taken for the purpose of operating that enterprise or halting competition with a government enterprise...." It is a well-established legal principle that because "expropriation proceedings derogate from the right of individuals to own property, the law governing these proceedings is strictly construed against the expropriating authority."
 
 State v. Estate of Davis
 
 ,
 
 572 So.2d 39
 
 , 42 (La. 1990). I disagree with the majority's conclusion there was no manifest error in the trial court's determination that Violet Dock Port's business enterprise or any of its assets were taken by the Port for the purpose of operating that enterprise or halting competition with Port enterprises. The Port's own expropriation plan was premised on taking Violet Port Dock's assets and operating its existing lay berthing business and nascent cargo handling activities to generate funds to finance a future dry and liquid bulk cargo facility. Accordingly, I would reverse the judgment of the trial court.
 

 See, e.g.
 
 , La. Const. 1879, art. 56: "Nor shall the State, nor any political corporation thereof[,] assume the liabilities of any political[,] municipal, parochial, private[,] or other corporation or association whatsoever; nor shall the State undertake to carry on the business of any such corporation or association, or become a part owner therein ...."
 

 Delegate Jenkins's assessment was echoed by another convention delegate, J. Burton Willis, who queried: "Isn't this a case of private enterprise against government ownership?" To which Delegate Jenkins replied: "I think it is." (Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, vol. VI, 39
 
 th
 
 day, Aug. 30, 1973, 1048).
 

 La. Const. art. I, § 4 (B)(1) provides:
 

 Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into the court for his benefit. Except as specifically authorized by Article VI, Section 21 of this Constitution property shall not be taken or damaged by the state or its political subdivisions: (a) for predominant use by any private person or entity; or (b) for transfer of ownership to any private person or entity.
 

 La. Const. art. I, § 4 (B)(3) provides:
 

 Neither economic development, enhancement of tax revenue, or any incidental benefit to the public shall be considered in determining whether the taking or damaging or property is for a public purpose pursuant to Subparagraph (1) of this Paragraph or Article VI, Section 23 of this Constitution.
 

 The majority opinion, in footnote 9, specifically acknowledges the irrelevance of this consideration in the case before this court, pointing out that the prohibition of La. Const. art. I, § 4 (B)(1) against taking or damaging property for predominant use by any private person or entity is subject to the exception found in Article VI, § 21(A), which permits public ports to acquire land through expropriation and lease that land to a private entity for management of the operations.
 
 St.
 

 Bernard Port
 
 , op. at 251 n.9.
 

 In essence, the situation presented here is akin to an improper jury instruction: the district court's per curiam reflects that it improperly instructed itself as to the applicable legal principles, interdicting the fact-finding process and necessitating
 
 de novo
 
 review.
 
 See, e.g.
 
 ,
 
 Picou v. Ferrara
 
 ,
 
 483 So.2d 915
 
 , 918 (La. 1986).
 

 The per curiam declares: "The St. Bernard Port's stated reason for expropriation was to build and operate a terminal to accommodate transport of liquid and solid bulk commodities into national and international commerce to and from St. Bernard."
 

 The option expired without being exercised by Vulcan.
 

 Testimony by Port officials that the Navy could "just sail away" proved incorrect. The Navy has not sailed away in the seven years since the expropriation occurred, and the Port still receives the income Violet previously enjoyed.
 

 See
 

 St. Bernard Port
 
 , op. at 247 n.3.
 

 The language of the constitution does not address the level or degree of competition.